UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TUFCO L.P.,

        Plaintiff,

      v.                        Case No. 21-C-1199

RECKITT BENCKISER (ENA) B.V.,

        Defendant.

## DECISION AND ORDER PARTIALLY GRANTING
## DEFENDANT'S MOTION TO DISMISS

Plaintiff Tufco L.P. brought this action against Defendant Reckitt Benckiser (ENA) B.V. (RB) for breach of contract and breach of the implied covenant of good faith and fair dealing. The dispute arises out of an agreement, negotiated and executed amidst the COVID-19 pandemic, in which Tufco agreed to supply RB with Lysol Disinfecting and T-Bone Canister wipes. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Before the court is RB's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motion will be partially granted.

## LEGAL STANDARD

A motion to dismiss for failure to state a claim tests the sufficiency of the complaint. Rule 8 requires a pleading to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead facts to "state a claim that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible where a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In deciding such a motion, the court construes the complaint in the light most favorable to the plaintiff, accepts all well-pleaded facts as true, and draws all reasonable inferences in the plaintiff's favor, but it need not accept as true statements of law or unsupported conclusory factual allegations. *Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021).

## ALLEGATIONS IN THE COMPLAINT

Tufco is a Delaware limited partnership, and RB is a foreign entity established under the laws of the Netherlands. Compl. ¶¶ 4–5, Dkt. No. 1. On September 15, 2020, Tufco and RB entered into a written supply agreement whereby Tufco would manufacture and supply RB with Lysol branded disinfecting wipes and T-Bone branded canister wipes. *Id.* at ¶ 7. The agreement included various terms, including the minimum purchase quantity for each product, the price for each product, and the penalties the parties would pay in the event RB failed to order product or Tufco failed to supply product. *Id.* at ¶¶ 8–9.

The agreement provided that RB was to begin ordering, and Tufco was to begin supplying, products on March 1, 2021. *Id.* at ¶ 13. Tufco alleges, however, that in January 2021, it began experiencing "significant and unforeseen labor shortages that were caused by an increase in COVID-19 infections within the State of Wisconsin and the extension of certain federal and state economic policies resulting therefrom that incentivized workers to refrain from work and/or remain unemployed during the global pandemic." *Id.* On January 27, 2021, worried that it would be unable to supply the minimum quantities of product set out in the agreement, Tufco notified RB that its production may be interrupted as a result of the labor shortage. *Id.* at ¶¶ 14–15. On March 16, 2021, Tufco formally notified RB that it was (1) invoking the agreement's force majeure

2

clause, (2) unable to meet the minimum quantity amount for March 2021, and (3) expecting the force majeure event to continue through April 30, 2021. *Id.* at ¶ 16.

Under § 17.1 of the agreement, a "force majeure event" is "any circumstance that is not within a party's reasonable control, has not occurred as a result of its negligence or other act or omission and which was not reasonably foreseeable and cannot be mitigated by taking reasonable steps." *Id.* at ¶ 17. That section also provides that force majeure events "may include civil commotion, embargo, lack of raw materials, governmental legislation or regulation, riot, invasion, war, fire, explosion, storm, flood, earthquake, subsidence, epidemic or other natural physical disaster." *Id.* at ¶ 18. Assuming compliance with § 17.2 of the agreement—which requires providing notice and evidence of the event to the other party, taking reasonable steps to remove or overcome the event, and mitigating the impact of the event—the agreement states that the party "shall be excused from performance of its unfulfilled obligations under" the agreement. *Id.* at ¶ 19.

On March 25, 2021, RB sent Tufco a letter disputing that Tufco had experienced a force majeure event and advising Tufco that it would not be excused from performance under § 17 of the agreement. *Id.* at ¶ 20. Tufco responded to RB's letter on April 6, 2021, and informed RB that it had "made great and unprecedented efforts" to overcome the event, such as engaging in extensive recruitment efforts, retaining multiple temp agencies, offering increased training incentives, and providing various financial incentives. *Id.* at ¶ 21. RB responded on May 19, 2021, again disputing that Tufco had experienced a force majeure event and taking the further step of notifying Tufco that it was terminating the agreement as to the Lysol Wipes and demanding that Tufco pay $849,000.00 to RB as a penalty for not producing the wipes. *Id.* at ¶ 22.

Tufco alleges that the notice of termination was "premature, improper, and failed to follow the terms of the Supply Agreement." *Id.* at ¶ 23. Section 20.2 of the agreement provides that the agreement may be terminated, or products may be removed from the agreement, at any time "upon either party giving to the other sixty (60) days' notice in writing if the other party commits a material breach of the terms of" the agreement. *Id.* at ¶ 24. The term "material breach" is not defined. See Dkt. No. 17-2. Tufco asserts that its failure to produce the minimum quantity of product during the force majeure event was not a material breach of the agreement, and as such, RB could not invoke termination of the agreement. Tufco further alleges that, even if a force majeure event did not exist, the remedy would not have been termination of the agreement but rather the payment of a penalty by Tufco under Paragraph 5 of Schedule One of the agreement. Compl. ¶ 25. That portion of the agreement states that, if Tufco is unable to produce the requisite quantity of product, it must pay a specified penalty to RB. *Id.* at ¶ 26. Tufco alleges that RB did not afford it the opportunity to make this payment but instead terminated the agreement before the invoice could be calculated and provided to Tufco. *Id.* at ¶ 27.

In any event, RB stopped placing orders for Lysol Wipes in June 2021 and reiterated that it would no longer place orders for them because it had deemed the agreement terminated. *Id.* at ¶ 28. In response, Tufco sent an invoice to RB in the amount of $13,488,934.55 for the penalty that RB allegedly owed to Tufco as a result of its failure to purchase the minimum quantity of product for the remainder of the term of the agreement. *Id.* at ¶ 29. RB refused to pay the invoice. *Id.* at ¶ 30. This was not the end of the dispute, however.

On August 20, 2021, the dispute carried over to the T-Bone Canister Wipes when RB informed Tufco that it would not be ordering T-Bone Canisters until February 2022 and that it would not pay any penalty to Tufco under Schedule One as a result of its failure to make monthly

4

orders during that period. *Id.* at ¶ 31. In response, Tufco sent RB an additional invoice for $712,494.40 based on RB's failure to order the minimum quantity of product for the months of June, July, and August 2021. *Id.* at ¶ 32. RB rejected this invoice, too. *Id.* at ¶ 33. Tufco alleges that, as a result of RB's breaches and anticipatory breaches of the agreement, failure to pay penalties owed under the agreement, and refusal to pay further accruing penalties, Tufco has been damaged in excess of $15,889,494.95. *Id.* at ¶ 36. Tufco also asserts that market standards, the parties' course of conduct, and the agreement's purpose dictate that RB, as the purchaser of the product, is obligated to purchase or reimburse Tufco for the cost of raw materials it acquired in reliance on RB's required orders. *Id.* at ¶ 42. Tufco alleges that it has requested RB purchase the raw materials, valued at approximately $2,500,000, but that it has refused to do so. Tufco alleges that, in total, it has been damaged in excess of $17,500,000.

## ANALYSIS

### A. Lysol Products

Under the terms of the contract between the parties, Tufco was to supply RB with minimal quantities of Lysol disinfecting wipes and T-Bone canister wipes for the period from March 2021 to the end of February 2023. Tufco admits that it failed to provide RB with the minimum quantity of Lysol wipes for March and April 2021 but claims that its failure to meet its obligation under the contract was due to a force majeure event as that term is defined in § 17 of the contract. RB contends that Tufco's allegations surrounding the force majeure event are insufficient to survive a motion to dismiss. RB argues that (1) the alleged force majeure event was, as a matter of law, reasonably foreseeable; (2) Tufco failed to allege that it was prevented from fulfilling its contractual obligations, as opposed to simply facing higher costs; (3) Tufco failed to allege facts that plausibly suggest the force majeure event could not be mitigated by taking reasonable steps;

and (4) even if the force majeure clause was properly invoked, RB nevertheless had the ability to terminate the contract. The court will address each argument in turn.

Recall that § 17 of the agreement requires the alleged force majeure event not be "reasonably foreseeable." *Id.* at ¶ 17. RB asserts that the supposed force majeure event at issue here, labor shortages caused by the COVID-19 pandemic and corresponding government policies, was just that—reasonably foreseeable. It points to various declarations of public health emergencies, executive orders, and passed legislation to support its argument that a sophisticated manufacturer, such as Tufco, should have reasonably foreseen the labor market turmoil on the horizon. Tufco, on the other hand, asserts that the question of whether a force majeure event was reasonably foreseeable is an issue of fact that this court cannot resolve at the pleadings stage.

RB spends much of its briefing on this issue pointing to the various indicators that it claims demonstrate a "hurricane on the horizon." It points to, among other things, spikes in COVID-19 infections, Governor Evers issuing declarations of public health emergencies, and enhancements and extensions of unemployment benefits. In general, RB's theory seems to be that, since COVID-19 was ongoing and continuously evolving as the parties negotiated and executed the agreement, Tufco should have reasonably foreseen the labor shortages that were allegedly caused by the COVID-19 pandemic and accompanying legislation. The difficulty with RB's argument, however, is that it assumes that, because COVID-19 introduced continual uncertainty into the economy, any and all effects that may stem from it were reasonably foreseeable as a matter of law. That is certainly one way of at looking at things, but a differing view is just as plausible—the constant uncertainty made it difficult to predict what would happen next, such that certain effects from COVID-19 may not have been reasonably foreseeable.

6

The two views described above encapsulate the heart of the dispute between the parties. RB contends that Tufco, by virtue of having experienced the pandemic, should have reasonably foreseen the impending labor shortage. Tufco contends that, also by virtue of having experienced the pandemic, nothing was certain and things were constantly evolving, such that it could not have reasonably foreseen the labor shortage it would soon face. This is not an appropriate dispute to resolve at the motion to dismiss stage. Indeed, a variety of courts have held that the determination of whether a force majeure clause is applicable is better suited for resolution following discovery. *See, e.g.*, *Gibson v. Lynn Univ., Inc.*, 504 F. Supp. 3d 1335, 1340 (S.D. Fla. 2020) ("Nevertheless, a determination of whether the *Force Majeure* Provision or other statements in Lynn's policies and publications foreclose Plaintiff's breach-of-contract claim is more appropriate at the summary judgment stage."); *Princeton Cmty. Hosp. Ass'n, Inc. v. Nuance Commc'ns, Inc.*, No. 1:19-00265, 2020 WL 1698363, at *5 (S.D. W. Va. Apr. 7, 2020) (noting that, when a party claims force majeure, discovery is appropriate). The issue of whether the labor shortage was reasonably foreseeable cannot be resolved at the pleadings stage.

RB argues that, even if the alleged force majeure event was not reasonably foreseeable as a matter of law, Tufco has failed to allege facts making its theory plausible. But there is nothing implausible about Tufco's allegation that it experienced "significant and unforeseen labor shortages" as a result of an increase in COVID-19 infections and corresponding legislation. RB is not entitled to dismissal on this basis.

RB asserts that Tufco has failed to plausibly allege that it was prevented from fulfilling its obligations under the agreement as a result of the force majeure event, as opposed to merely encountering increased costs. But Tufco's complaint does include plausible allegations on this point. Tufco alleges that, as a result of the unforeseen labor shortage stemming from COVID-19,

7

it "grew concerned that it would be *unable* to produce the Minimum Quantity Amount under the Supply Agreement."  Compl. ¶ 14 (emphasis added).  Tufco further alleges that, on March 16, 2021, it confirmed with RB that it would be "unable" to meet the minimum quantity amount for March 2021 and that the force majeure event would continue through April 30, 2021.  *Id.* at ¶ 16. This is all that Tufco was required to allege.

RB contends that Tufco failed to allege that its production was actually halted or that its inability to produce was not due to factors within its control, such as by attempting to hire additional workers through raising wages or otherwise making employment at Tufco more attractive.  But Tufco need not allege that its entire facility was shutdown.  All it needed to allege was that the force majeure event prevented it from fulfilling its obligations under the agreement. It did so.  *Id.* at ¶¶ 14, 16.  Tufco further alleges that it made efforts to attract and retain employees through "retaining multiple temp agencies, offering increased training initiatives, and providing various financial incentives such as hiring bonuses, retention bonuses, and additional overtime pay."  *Id.* at ¶ 21.  Tufco's complaint contains sufficient allegations to support its claim that it was prevented from fulfilling its obligations under the agreement due to the force majeure event.

RB also argues that Tufco has failed to allege facts that plausibly establish that the force majeure event could not be mitigated by taking reasonable steps.  But again, Tufco alleged that it attempted to mitigate the labor shortage by retaining temp agencies and by offering increased training initiatives and financial incentives, such as hiring bonuses, retention bonuses, and additional overtime pay.  *Id.*  Similar to the argument above, RB responds by noting that Tufco did not allege that it could not have subcontracted its obligations or otherwise prioritized RB's products over others.  Tufco need not list each and every option that it considered and ruled out in order to state a claim.  If it turns out that subcontracting or product prioritization would have been

a viable option for Tufco, that evidence will come out in discovery. At this stage, Tufco has adequately alleged that it took reasonable steps to mitigate the force majeure event and that its efforts were unsuccessful. RB may dispute the veracity of these allegations or believe that Tufco could have done more, but those arguments are more appropriately addressed after discovery at trial or on a motion for summary judgment, not on a motion to dismiss.

RB also contends that, even if Tufco has plausibly alleged the existence of a force majeure event, it was still within its right to sever the Lysol Wipes from the agreement. Citing § 17.3 of the agreement, RB asserts that, because the force majeure event lasted in excess of 60 days, it was entitled to remove Lysol Wipes from the agreement. Section 17.3 provides: "If a Force Majeure Event prevents performance by a party of any obligations hereunder for a continuous period in excess of 60 days, the other party shall be entitled to terminate this Agreement and/or any individual Order by written notice at any time after such 60 day period without penalty to either Party so long as such Force Majeure Event continues." Dkt. No. 17-2 at § 17.3. Even assuming the provision applies here, it would only allow RB to terminate the entire agreement, not a portion of it. Indeed, the agreement demonstrates that the parties knew how to draft language accomplishing a single-product termination. Section 20.2, which deals with material breaches of the agreement, provides that the agreement "may be terminated, *or Products may be removed from this Agreement* . . . if the other party commits a material breach of the terms of this Agreement." *Id.* at § 20.2 (emphasis added). Section 17.3 does not provide that a product line may be removed from the agreement in the event a force majeure event exceeds 60 days; instead, it provides only that the agreement as a whole, or any individual orders, may be terminated. *Id.* at § 17.3

RB insists that, even if § 17.3 only allows for termination of the entire agreement, Tufco has not plausibly alleged that it was damaged by the partial termination. It states that Tufco would

have been worse off had RB terminated the agreement in its entirety and that Tufco has not alleged otherwise. But the question is not whether Tufco would have been worse off if RB had terminated the entire agreement; the question at this stage is whether RB acted within its rights in partially terminating the contract as to only one product. Tufco was certainly harmed by RB's action, even if it would have suffered greater harm had RB terminated the entire agreement. Based on the language of § 17.3, the court is unable to conclude as a matter of law that RB was entitled to take such action at least at this stage of the case. Accordingly, RB is not entitled to dismissal on this ground either.

In sum, Tufco has plausibly alleged that it suffered a force majeure event under the agreement. Furthermore, § 17.3 of the agreement only allowed RB to terminate the agreement in its entirety, not remove a product line from the agreement. Therefore, RB's motion to dismiss on the issue of force majeure will be denied.

## B. T-Bone Canister Wipes

Next, RB asserts that Tufco fails to state a claim that RB breached the agreement by failing to order minimum quantities of T-Bone Canister Wipes because the contract with respect to T-Bone Canister Wipes is unenforceable. Under Delaware law, which governs under the terms of the contract, "a valid contract exists when (1) the parties intended that the instrument would bind them, demonstrated at least in part by its inclusion of all material terms; (2) these terms are sufficiently definite; and (3) the putative agreement is supported by legal consideration." *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1229 (Del. 2018). RB does not argue that the first or third prongs are not satisfied. Instead, it argues that the second prong is not satisfied because the agreement contains conflicting minimum order quantities of T-Bone Canister Wipes.

10

Schedule One of the agreement provides a variety of information.  For one, it contains a "terms and conditions" section that states: "For TBone Canister wipes, the pricing above is based on 2 runs per year for 30ct (every 6 months) and 70ct every other month runs year 1.  Year 2, it would work out to every other month runs for both counts."  Dkt. No. 17-2 at 11.  The language "the pricing above" appears to refer to tables that list the volume of T-Bone Canister Wipes per month.  It goes on to note the following figures: "70ct: MOQ: 83,325 cases every other month . . . 30ct: MOQ: 11,900 cases every other month."  *Id.*  RB explains that "MOQ" means "Minimum Order Quantity."  It is unclear whether the MOQ numbers correspond in any way with the volume tables.  *See id.*

RB argues that the numbers listed in the table cannot be reconciled with the MOQ numbers. For example, using the table to calculate the volume for T-Bone Canister Wipes for March and April 2021 results in 69,243 cases for the 70-count and 1,315 cases for the 30-count.  *Id.*  However, the MOQ listed below the table lists 83,325 cases for the 70-count and 11,900 cases for the 30-count.  *Id.*  RB claims that, because these numbers conflict, the parties did not reach a definite agreement on the material term of quantity, and therefore, the agreement is unenforceable.

In examining whether a contract is sufficiently definite, the Supreme Court of Delaware has adopted the test from the Restatement (Second) of Contracts § 33(2).  *Campbell*, 187 A.3d at 1232.  Under the Restatement, a contract is "sufficiently definite and certain to be enforceable if the court can—based upon the agreement's terms and applying proper rules of construction and principles of equity—ascertain what the parties have agreed to do."  *Id.*  Here, it is clear that the parties contracted for the supply of a minimum quantity of T-Bone Canister Wipes.  Although the numbers conflict, the court cannot say, as a matter of law, that the agreement is so indefinite as to render it unenforceable.  "If the parties have concluded a transaction in which it appears that they

11

intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left." *Id.* (quoting 1–4 *Corbin on Contracts* § 4.1 (1993) (internal quotation marks omitted)). It appears that at least some orders for the T-Bone Canister Wipes were issued and acted upon. Evidence surrounding these transactions may clarify the parties' intentions. At least at this stage, the court is unable to say that this portion of the contract is void. Accordingly, RB's motion to dismiss this part of Tufco's claim will also be denied.

## C. Breach of the Implied Covenant of Good Faith and Fair Dealing

Tufco's complaint also contains a claim for breach of the implied covenant of good faith and fair dealing. Compl. ¶¶ 37–44. However, Tufco explicitly elected not to respond to RB's arguments in support of its motion to dismiss this claim. *See* Dkt. No. 21 at 22 ("As RB acknowledges that Tufco's claim for breach of the implied covenant of good faith and fair dealing arises from the express terms of the Supply Agreement, and that Tufco's claims do not implicate[] any implied rights in the Supply Agreement, Tufco need not respond to RB's motion with respect to its implied covenant cause of action."). Tufco's failure to respond to RB's argument constitutes a waiver, and therefore, its separate claim for breach of the implied covenant of good faith and fair dealing will be dismissed. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument—as the Bontes have done here—results in waiver.").

## D. Motions to Restrict

The parties have also filed various motions to restrict. First, RB seeks to seal its unredacted memorandum in support of its motion to dismiss and the agreement itself. Dkt. No. 17. The court will grant the motion with respect to the agreement (Dkt. No. 17-2), as it contains a variety of sensitive and competitive commercial information, but deny the motion with respect to the

12

memorandum for the reasons set forth in the court's April 29, 2022, order. *See* Dkt. No. 19. Likewise, the court will deny the remaining motions to restrict (Dkt. Nos. 20 & 25) for the reasons set forth in the court's April 29, 2022, order.

## CONCLUSION

For the foregoing reasons, RB's motion to dismiss (Dkt. No. 16) is **GRANTED-IN-PART** and **DENIED-IN-PART**. Tufco's claim for breach of contract may proceed. Its claim for breach of the implied covenant of good faith and fair dealing, however, is dismissed. RB's motion to seal documents (Dkt. No. 17) is **GRANTED-IN-PART** and **DENIED-IN-PART**. The parties' agreement (Dkt. No. 17-2) remains restricted to case participants. However, the Clerk is directed to unseal RB's memorandum in support of its motion to dismiss (Dkt. No. 17-1). Finally, the parties remaining motions to restrict (Dkt. Nos. 20 & 25) are **DENIED**. The Clerk is directed to remove the restricted designation from Tufco's brief in opposition (Dkt. No. 21) and RB's unredacted reply brief (Dkt. No. 26-1). The Clerk is directed to set the matter on the court's calendar for a Rule 16 telephonic scheduling conference.

**SO ORDERED** at Green Bay, Wisconsin this 21st day of October, 2022.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

13