UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

TUFCO L.P.,

        Plaintiff,

        v.                                                       Case No. 21-C-1199

RECKITT BENCKISER (ENA) B.V.,

        Defendant,

       and

GRIFFIN HOLDINGS, LLC,

        Counterclaim-Defendant.

---

## DECISION AND ORDER

---

This diversity action arises out of a dispute over a Supply Agreement under which Plaintiff Tufco L.P. agreed to supply and Defendant Reckitt Benckiser (ENA) B.V. (hereinafter, "RB"), agreed to purchase minimum quantities of disinfecting wipes over a twenty-two-month term. The Agreement was dated August 1, 2020, and called for delivery to begin by March 1, 2021. Tufco claims that due to "significant and unforeseen labor shortages that were caused by an increase in COVID-19 infections within the State of Wisconsin and the extension of certain federal and state economic policies resulting therefrom that incentivized workers to refrain from work and/or remain unemployed during the global pandemic," Compl. ¶ 13, it was unable to produce the minimum quantities of wipes called for by the Agreement. Tufco invoked the Force Majeure provision of the Agreement to excuse its nonperformance, but RB rejected Tufco's assertion that its nonperformance was excused and partially terminated the Agreement. Tufco thereafter

commenced this action against RB for breach of contract and breach of the implied duty of good faith and fair dealing.

In a previous decision, the court partially granted RB's motion to dismiss. Dkt. No. 27. The court granted RB's motion as to Tufco's claim for breach of an implied duty of good faith and fair dealing but denied RB's motion as to the claim for breach of contract. In denying RB's motion to dismiss the claim for breach of contract, the court rejected its argument that the complaint failed as a matter of law to plausibly allege facts sufficient to establish force majeure within the meaning of the Agreement. RB thereafter filed its Answer and Counterclaims. Dkt. No. 38. It also filed a motion for joinder of Griffin Holdings, LLC, the parent of Tufco, as a counterclaim defendant, Dkt. No. 39, which the Court granted on January 20, 2023. RB has asserted six counterclaims against Tufco and/or Griffin: three for breach of contract against Tufco, along with fraud in the inducement against both Tufco and Griffin, breach of the implied covenant of good faith and fair dealing against Tufco, and tortious interference with contract against Griffin. Presently before the court is a motion to dismiss RB's counterclaims for fraud in the inducement, breach of the implied covenant of good faith and fair dealing, and tortious interference with contract.

## LEGAL STANDARD

The legal standard for a motion to dismiss a counterclaim is the same as the standard applied to a motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. A motion to dismiss for failure to state a claim tests the legal sufficiency of the pleading. *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 776 (7th Cir. 2022).

In *Twombly*, the Court held that to survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In so ruling, the Court expressed concern over the cost of discovery, particularly in complex anti-trust litigation of the kind presented in the case itself. The

Court rejected the view that judicial supervision of the discovery process and the availability of summary judgment could effectively curb discovery abuse and expense. *Id.* at 559–60 ("It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through careful case management, . . . given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side. *See, e.g.*, Frank H. Easterbrook, *Discovery as Abuse*, 69 B.U. L. REV. 635, 638 (1989) ('Judges can do little about impositional discovery when parties control the legal claims to be presented and conduct the discovery themselves'). And it is self-evident that the problem of discovery abuse cannot be solved by careful scrutiny of evidence at the summary judgment stage, much less lucid instructions to juries . . . .") (internal quotation marks and citations omitted)). Based upon these considerations, the Court concluded that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entite[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (internal citations omitted).

In *Iqbal*, a civil rights action, the Court made clear that the pleading standard announced in *Twombly* was not confined to complaints asserting anti-trust claims but was grounded in the language of Rule 8(a) of the Federal Rules of Civil Procedure: "Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . and it applies to antitrust and discrimination suits alike." *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009). *Iqbal* also highlighted "two working principles" underlying *Twombly*. *Id.* at 678. First, the Court noted that the rule requiring courts to accept as true all of the allegations of the complaint did not apply to legal conclusions: "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Though it acknowledged that "Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era," the Court

3

emphasized that "it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678–79. The second *Twombly* principle the Court highlighted in *Iqbal* is that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). The Court emphasized that determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* While "not akin to a probability requirement," the standard requires "more than a sheer possibility that the defendant acted unlawfully." *Id.* at 678. These are the principles that govern the instant motion.

## ALLEGATIONS CONTAINED IN THE COUNTERCLAIM

Tufco manufactures wet wipes from its facility in Green Bay, Wisconsin. Counterclaim ¶ 14, Dkt. No. 38. Griffin owns 100 percent of Tufco Technologies Inc. Tufco Technologies Inc. is the sole member of Tufco LLC. Tufco LLC and Tufco Technologies Inc. are the only members of Tufco L.P. *Id.* ¶ 137. As a result, Griffin owns 100 percent of Tufco L.P. *Id.* ¶ 138. Egal Gabbay, a manager of Griffin, is listed as the sole director of Tufco Technologies Inc. *Id.* ¶ 139. Griffin controlled the operations of Tufco L.P. and members of Griffin Holdings held management positions in Tufco L.P. and took action simultaneously under the auspices of both companies. *Id.* ¶ 140.

Due to the COVID-19 pandemic, demand for disinfectant products skyrocketed, including demand for RB's Lysol disinfectant-wipe products and other products manufactured by Tufco. *Id.* ¶ 35. Tufco used the bargaining strength afforded to it by the COVID-19 pandemic and the increased need for disinfecting products to negotiate against customers like RB. *Id.* ¶ 54. In

4

particular, after the pandemic hit, Tufco demanded that customers sign years-long contracts with mandatory minimum orders before Tufco would produce any disinfectant products. *Id.* ¶ 55.

In April 2020, RB and Tufco began negotiations relating to the Agreement. *Id.* ¶ 56. On April 13, 2020, Loddie Geurts, Vice President of Sales & Product Development for Tufco, sent an email to RB, stating that Tufco was requiring minimum volume commitments and that Tufco's other customers were committing to minimum volumes. *Id.* ¶ 57. The next day, Geurts explained in another email to RB that Tufco required "a take or pay type agreement per month" before it would make products because Tufco's production "capacity is highly sought by many customers with the given COVID19 situation." *Id.* ¶ 58. On April 15, 2020, RB's team replied, explaining that RB was looking for a high-volume capacity per month. *Id.* ¶ 59. In response, Tufco and Griffin, through their executives and management, made statements affirming Tufco's capacity to meet RB's needs for canister wipes. *Id.* ¶ 60.

On May 11, 2020, Geurts emailed RB, stating that Tufco could produce "up to 4MM [canisters] per month" in 2021. *Id.* ¶ 61 (alterations in original). On June 18, 2020, Geurts sent another email to RB, stating that "Tufco can support [ ] 4MM canisters per month volume" in 2021. *Id.* ¶ 62 (alterations in original). Geurts understood that this large-volume capacity was material to RB. RB alleges that, to induce RB to sign the Agreement, Geurts threatened in a June 18, 2020 email that, if no agreement was signed by July 1, 2020, "there is no guarantee there will be any . . . canister volume left to offer RB as we are in the middle of contract negotiations with customers currently." *Id.* ¶ 63 (alterations in original). On August 3, 2020, Shaun Gabbay sent an email to RB from a Griffin email account as a member of Griffin, confirming that Tufco could "guarantee" its canister volumes to RB at least until August 14, 2020. *Id.* ¶¶ 64–65. Shaun Gabbay stated that, if no agreement was signed by that date, Tufco would release "the reserved monthly capacities to customers that have been waiting in the cue [*sic*]." *Id.* ¶ 64. On August 18, 2020,

5

Geurts sent an email to RB stating that Tufco "should be fine with" "1.5MM canisters per month" of Lysol canisters. *Id.* ¶ 66. Geurts stated, "Capacity for the above volumes . . . will be locked in with signed contract agreement, as we are simultaneously negotiating contracts with other customers to which capacity will be filled on first come, first serve basis." *Id.* (alterations in original). On August 19, 2020, Geurts sent an email to RB, stating that Tufco was "ok with [ ] additional volume for TBONE [canister wipes] over the 1.5MM per month for the base business" of Lysol canister wipes. *Id.* ¶ 67 (alterations in original). Relying on Tufco's representations that it could produce RB's required volume of wipes, RB signed the Agreement with Tufco on September 15, 2020. *Id.* ¶¶ 68, 75. Under the Agreement, Tufco agreed to supply and RB agreed to purchase minimum quantities of Lysol canister and T-Bone canister wipes over a twenty-two-month term.

To meet the increased demand for disinfectant products, Tufco attempted to add new equipment and hire more workers. But in the summer and fall of 2020, Tufco still struggled to manage the influx of demand for its product caused by the COVID-19 pandemic. *Id.* ¶ 36. It hosted a job fair on July 29, 2020 seeking workers. *Id.* ¶ 37. Tufco did not share information about its job fair or its urgent need for workers directly with RB and instead told RB that it was ready to perform. *Id.* ¶ 40. But Tufco was unable to meet the demands of its customers. *Id.* ¶ 41. Throughout 2020 and into 2021, Tufco told customers that it did not have the capacity to fulfill the orders placed with it. *Id.* ¶ 42. For example, on October 6, 2020, Tufco told one customer that it would not be able to fill orders for disinfectant wipes that the customer had placed in March and April 2020 until at least 2021 due to the effects of COVID-19. *Id.* ¶¶ 43–44. In February 2021, Tufco told this same customer that the orders would be delayed until at least the third quarter of 2021. *Id.* ¶ 45. Tufco did not inform RB about its inability to meet this customer's orders, and

6

Case 1:21-cv-01199-WCG   Filed 06/30/23   Page 6 of 18   Document 48

RB had no knowledge of Tufco's statements to this customer until April and July of 2022. *Id.* ¶ 46.

In August 2020, separate from the Agreement, RB placed and Tufco accepted three Purchase Orders for 50,000 cases of Lysol canister wipes. *Id.* ¶ 47. One order was to be produced and delivered in October 2020, another in November 2020, and the third in December 2020. *Id.* ¶ 48. Tufco's first two production and deliveries were delayed by multiple months, and Tufco never produced or delivered the third order. *Id.* ¶ 49. In December 2020, RB placed orders for 1.5 million units of Lysol canister wipes to be produced and delivered in March 2021. *Id.* ¶ 84. In January 2021, RB placed additional orders for 1.5 million units of Lysol canister wipes to be produced and delivered in April 2021 as well as orders for T-Bone canister wipes to be delivered in March 2021. *Id.* ¶¶ 85–86.

On January 26, 2021, Geurts sent an email to RB as a follow up to a discussion about the labor/production delays Tufco had been experiencing that impacted its "TOP contract volume commitments." *Id.* ¶ 87. Geurts stated that "the recent surge in cases from the COVID-19 pandemic has resulted in a labor shortage around the country" and that "COVID-19 prevention and protocols have caused significant interruptions and diminished production efficiencies." *Id.* He indicated that Tufco was "currently experiencing unforeseen delays in production that are beyond [its] control as a result of the COVID-19 pandemic." *Id.* Geurts attached a spreadsheet showing Tufco's "best projection at this time for the canister production plan." *Id.* ¶ 88. Under the plan, Tufco would not produce any wipes in March or April 2021 but would be fully producing the required minimum wipes by May 2021. *Id.* On January 27, 2021, Shaun Gabbay and Geurts held an online meeting with RB regarding Tufco's "supply issues." *Id.* ¶ 89. Geurts also sent another email to RB to "follow up" and stated that "the recent surge in cases from the COVID-19 pandemic has resulted in a labor shortage around the country" and that "COVID-19 prevention

and protocols have caused significant interruptions and diminished production efficiencies." *Id.* He again claimed that Tufco was "experiencing unforeseen delays in production that are beyond [its] control as a result of the COVID-19 pandemic." *Id.* Geurts explained that while the equipment designated for RB production was ready, Tufco did "not have the staffing levels needed to run the line due to various impacts . . . discussed from COVID." *Id.* ¶ 91. He also reiterated that Tufco would not be able to supply any wipes to RB in March or April 2021. *Id.* RB responded, explaining that RB would suffer damages if Tufco failed to produce as promised and requested that Tufco "honor" the Agreement. *Id.* ¶ 92.

On February 2, 2021, Geurts emailed RB, explaining that "Tufco is continuing to diligently work on the staffing shortage issue due to the many impacts from the COVID pandemic that are outside of [its] immediate control," that there "have not been any new developments" regarding Tufco's ability to produce, and that everything was on track with the revised schedule Tufco presented the week prior. *Id.* ¶ 93. RB responded, explaining the damages RB would suffer if Tufco reneged on its agreement to supply RB with wipes. *Id.* ¶ 94.

On February 18, 2021, Geurts emailed RB, claiming that Tufco had been able to make some improvements to the timing of production and would now be able to produce some T-Bone products in March and April. But he explained that Tufco would produce significantly fewer canisters in May than it previously claimed. *Id.* ¶ 96. Because Tufco could not fully produce in May, it requested in March that RB allocate the limited production capacity available among the products in the Agreement. *Id.* ¶ 97. RB adjusted its orders to Tufco's limited capacity such that Tufco would produce the Lysol canister wipes, originally ordered for March and April, in June and July 2021. *Id.* ¶¶ 97–98.

On March 16, 2021, Geurts emailed RB, stating that "over the last several months," Tufco had been facing challenges with personnel to operate production lines, and that, as a result of recent

8

events related to Tufco's labor shortages, it had "to advise RB of a Force Majeure notification." *Id.* ¶ 99. Geurts confirmed that Tufco was still planning to produce the T-Bone quantities that the parties had been discussing in March and April. *Id.* Attached to the email was a letter signed by Egal Gabbay as Tufco's Chief Executive Officer. *Id.* ¶ 100. Egal Gabbay's contact information included a Griffin email address and phone number. *Id.*

In the letter, Egal Gabbay advised that Tufco experienced significant delays in its supply chain because of unforeseen labor shortages resulting from the ongoing COVID-19 global pandemic and the economic policies resulting therefrom. *Id.* ¶ 101. He claimed that the delays constitute a force majeure event under Section 17.1 of the Agreement and that the force majeure event will unfortunately prevent Tufco from fulfilling its obligations under the Agreement commencing as of March 1, 2021. *Id.* Egal Gabbay stated that Tufco estimated that the force majeure event would continue for approximately 60 days from the date of commencement, or April 30, 2021. *Id.*

On March 25, 2021, RB, through counsel, disputed Tufco's claim of force majeure. *Id.* ¶ 102. Tufco responded, through counsel, on April 6, 2021, stating that the force majeure was "due, in large part, to the entirely unforeseeable second wave of COVID-19 infections that began in the fall of 2020, and the related impact of governmental extensions of unemployment benefits." *Id.* ¶ 103. RB asserts that the "second wave" of infections and the governmental extensions of unemployment benefits began before Tufco signed the Agreement and could not have been unforeseeable. It maintains that Governor Evers predicted such a wave of infections in his September 22, 2020 emergency order. *Id.* ¶ 104.

On April 14, 2021, Geurts emailed RB, stating that "Tufco continues to face hiring and retention challenges with the labor force that are impacting [its] planned efficiencies and capacities." *Id.* ¶ 105. He attached a revised production capacity timeline to his email, under

9

which Tufco would be able to produce only a limited number of canisters in May, June, July, and August, and would not meet minimum requirements until September. *Id.*

On May 19, 2021, RB, through counsel, notified Tufco that it had failed to establish a force majeure event as defined by the Agreement and, therefore, failed to provide a valid excuse for its nonperformance. *Id.* ¶ 107. RB invoked Section 20.2 of the Agreement and terminated the Agreement as to the Lysol canister wipes, effective 60 days from the date of the letter. RB did not terminate the Agreement as to the T-Bone wipes. *Id.* RB explained that, as a result of Tufco's failure to produce the requisite quantities for March and April, Tufco owed RB a penalty of nearly $850,000. Tufco did not pay the penalty. *Id.* ¶ 108. Instead, Tufco sent RB an invoice for nearly $13.5 million. *Id.* ¶ 109. The invoice included penalty amounts as well as costs for raw materials, administrative fees, and disposal fees. *Id.* Tufco filled none of RB's orders for Lysol canister wipes in 2021. Tufco produced no Lysol canister wipes for RB during March, April, May, June, July, or August 2021. *Id.* ¶ 110.

## ANALYSIS

### A. Choice of Law

The court must first determine the applicable substantive law. Tufco's motion to dismiss challenges RB's counterclaims for fraud in the inducement against Tufco and Griffin, breach of the implied covenant of good faith and fair dealing against Tufco, and tortious interference with contract against Griffin. In RB's view, the court should apply Delaware law to all of its counterclaims against Tufco. RB argues that the court need not even conduct a choice of law analysis because Tufco waived any choice-of-law argument with respect to its tort counterclaim against it by failing to counter RB's argument that Delaware law applies.

While "the choice of law issue may be waived . . . if a party fails to assert it," *see McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014), the court does not find that Tufco

10

acquiesced to the application of Delaware law. In its brief in support of its motion to dismiss, Tufco analyzed RB's counterclaim for fraud in the inducement under both Wisconsin and Delaware law. Tufco did not make an explicit choice-of-law argument because it believed it prevailed under both Wisconsin law and Delaware law. But by citing Wisconsin cases in support of its argument, Tufco implicitly argued that Wisconsin law applies. Under these circumstances, the court declines to find that Tufco waived the choice-of-law issue in this case and will proceed to a choice-of-law analysis.

In a diversity action, the court will apply the choice-of-law principles of the jurisdiction in which it sits to determine the substantive law to be applied. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). Therefore, Wisconsin's choice-of-law principles apply. The choice of law is made on an issue-by-issue basis. *Int'l Adm'rs, Inc. v. Life Ins. Co.*, 753 F.2d 1373, 1376 n.4 (7th Cir. 1985).

The Agreement contains a choice-of-law provision, which states: "This Agreement shall be governed by and construed in accordance with the laws of State of Delaware, save as to conflict of law provisions." Dkt. No. 17-2 at 10. "As a general rule, Wisconsin law recognizes validly executed choice-of-law provisions in the absence of any public policy reasons to disregard them." *Taurus IP v. DaimlerChrysler Corp.*, 519 F. Supp. 2d 905, 923 (W.D. Wis. 2007), *aff'd sub nom. Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306 (Fed. Cir. 2013) (citing *Bush v. Nat'l Sch. Studios, Inc.*, 139 Wis. 2d 635, 642, 407 N.W.2d 883 (1987)). Accordingly, Delaware law will govern RB's counterclaim against Tufco for breach of the implied covenant of good faith and fair dealing.

The analysis is different for RB's tort claims, however. "A choice of law provision will not be construed to govern tort as well as contract disputes unless it is clear that this is what the parties intended." *CERAbio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 987 (7th Cir. 2005)

11

(citing *Kuehn v. Children's Hosp.*, 119 F.3d 1296, 1302 (7th Cir. 1997)). Nothing in the contract suggests that tort claims are to be governed by Delaware law. In tort cases, Wisconsin courts "begin with the presumption that the law of the forum applies unless nonforum contacts are of greater significance." *Glaeske v. Shaw*, 2003 WI App 71, ¶ 22, 261 Wis. 2d 549, 661 N.W.2d 420 (citing *State Farm Mut. Auto. Ins. Co. v. Gillette*, 2002 WI 31, ¶ 26, 251 Wis. 2d 561, 641 N.W.2d 662). Where neither potential forum has clearly more significant contacts, the court moves on to analyze five "choice influencing factors," including predictability of results, maintenance of interstate and international order, simplification of the judicial task, advancement of the forum's governmental interests, and application of the better rule of law. *Id.*

As to RB's counterclaims for fraud in the inducement and tortious interference with contract against Griffin, the Wisconsin contacts of the parties' dispute are of greater significance than the Delaware contacts. Tufco is a Wisconsin company and has manufactured the wipes in question in Green Bay, Wisconsin "for decades." Counterclaim ¶ 14. The contract was to be performed in Wisconsin. And Tufco's claimed labor shortages were a result of, as this court previously noted, "spikes in COVID-19 infections, Governor Evers issuing declarations of public health emergencies, and enhancements and extensions of unemployment benefits." Dkt. No. 27 at 6; *see also* Counterclaim ¶¶ 16–34. Delaware, on the other hand, is mentioned in RB's Answer only as a state of which Tufco is a citizen for purposes of federal subject matter jurisdiction and because its law is applicable as to claims arising out of Tufco and RB's relationship under the Agreement. As such, Delaware appears to play no role in the parties' actual dealings or their present dispute, whereas Wisconsin does. Accordingly, the court will apply Wisconsin law to RB's counterclaims for fraud in the inducement and tortious interference with contract.

## B. Fraud in the Inducement

Tufco and Griffin argue that RB has failed to state a plausible claim of fraud in the inducement. To state a claim of fraud in the inducement under Wisconsin law, RB must allege that "(1) [Tufco and Griffin] made a factual representation; (2) which was untrue; (3) [Tufco and Griffin] either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false; (4) [Tufco and Griffin] made the representation with intent to defraud and to induce another to act upon it; and (5) [RB] believed the statement to be true and relied on it to [its] detriment." *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 12, 283 Wis. 2d 555, 699 N.W.2d 205. The misrepresentation must have occurred before the formation of the contract. *Id.* at ¶ 30.

In its counterclaim, RB alleges that Tufco and Griffin made false representations about Tufco's ability to produce canister wipes beginning in March 2021 to induce RB to enter into the Agreement. Counterclaim ¶¶ 159–61. In particular, RB asserts that Geurts made statements in May, June, and August 2020 that Tufco could produce at least 1.5 million monthly units of Lysol canister wipes and additional units of T-Bone canister wipes beginning in March 2021. *Id.* ¶ 160. In addition, Shaun Gabbay made statements in August 2020 that Tufco could "guarantee" the Lysol canister volumes to RB. *Id.* ¶ 161. RB alleges that the representations about Tufco's ability to produce were material to RB and to the Agreement because RB would not have entered into the Agreement if Tufco could not produce the promised wipes. *Id.* ¶ 165. It also alleges that it relied on Tufco's and Griffin's representations about Tufco's ability to produce wipes in deciding to enter into the Agreement and that it was harmed by its reliance. *Id.* ¶¶ 166–67. RB claims that Tufco did not produce the promised wipes and RB suffered damages as a result. *Id.* ¶ 167.

Tufco and Griffin argue that RB has not adequately alleged that they made any false assurance or misrepresentation of implied fact. They assert that their alleged statements in 2020

13

regarding Tufco's 2021 production capacity were "simply predictions of its future production capacity" and are not actionable misrepresentations. Tufco Reply Br. at 6, Dkt. No. 46. A party's false assertion must generally "relate to present or pre-existing events or facts." *Hartwig v. Bitter*, 29 Wis. 2d 653, 656, 139 N.W.2d 644 (1966). Stated differently, "an action for misrepresentation cannot be based on future events or facts not in existence when the representation was made, or on unfulfilled promises." *Schurmann v. Neau*, 2001 WI App 4, ¶ 10, 240 Wis. 2d 719, 624 N.W.2d 157 (citation omitted); *see also Johnson Bank v. Tiziani*, 2011 WI App 155, ¶ 15, 337 Wis. 2d 737, 807 N.W.2d 33 ("promises or predictions of future events are not ordinarily categorized as misrepresentations"). There is, however, an exception to this rule when the party making the statement "has a present intention not to perform" or "is aware of present facts incompatible" with the statement. *Hartwig*, 29 Wis. 2d at 658.

RB asserts that Tufco's and Griffin's statements fit within the exception to the general rule because they were aware of facts that were inconsistent with their statements about Tufco's production capabilities. "[A] promise or prediction of future events that implies the existence of facts from which the promised or predicted consequences will follow . . . is a misrepresentation as to those implied facts." *Johnson Bank*, 337 Wis. 2d 737, ¶ 17 (citing *Hartwig*, 29 Wis. 2d at 657–58). RB alleges that Geurts and Shaun Gabbay knew or reasonably should have known that Tufco did not have the ability to handle the volume promised because they knew or reasonably should have known of the following facts incompatible with this prediction:

> Tufco did not yet have the equipment installed to produce extra canisters, let alone staffing to run the equipment. In late July, Tufco was hosting a job fair and scrambling to find workers to fill positions to keep up with its "booming" business. In October 2020, Tufco was telling other customers that it could not fill orders placed to it in March and April. And Tufco was taking on numerous contracts with other customers that negatively impacted its capacity to produce wipes.

14

Counterclaim ¶ 163. It asserts that Tufco and Griffin failed to disclose these material facts to RB. RB contends that Tufco's and Griffin's 2020 statements about Tufco's production capabilities were not in accordance with the facts as evidenced by Tufco's failure to later produce the canister wipes. But those facts are not incompatible with Tufco's and Griffin's representations in May, June, and August 2020 to RB about Tufco's production capabilities in 2021. Tufco and RB negotiated in the summer of 2020 about Tufco's capacity to produce the canister wipes beginning in March 2021. Although RB also cites instances where Tufco was unable to fulfill orders in October 2020, this occurred months after the purported statements were made and Tufco and RB entered into the Agreement. In addition, Tufco's staffing shortage at the time the statements were made is not incompatible with an intent to meet production demand in the future. None of the facts RB alleges are inconsistent with Tufco's expected production capacity in March 2021, when Tufco's first delivery of wipes was required. RB has not alleged facts that Tufco had any intent to violate the Agreement or that Tufco and Griffin were aware of facts incompatible with their statements. Accordingly, RB has failed to state a fraud in the inducement claim against Tufco and Griffin, and the counterclaim is dismissed.

**C. Breach of the Implied Covenant of Good Faith and Fair Dealing**

RB also asserts that Tufco breached the implied covenant of good faith and fair dealing. "To state a claim for breach of the implied covenant, a complaint must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *BET FRX LLC v. Myers*, No. 2019-894, 2022 WL 1236955, at *5 (Del. Ch. Apr. 27, 2022) (internal quotation marks and citation omitted). RB alleges that Tufco breached the implied obligation to refrain from providing false information by making a false claim of force majeure in an attempt to avoid the consequences of nonperformance under the Agreement.

Tufco argues that RB's breach of the implied covenant of good faith and fair dealing counterclaim should be dismissed because it is duplicative of RB's breach of contract counterclaims. "In implied covenant matters, the existing contract terms control." *Sarraf 2018 Family Trust v. RP Holdco, LLC*, No. 21C-02-006, 2022 WL 10093538, at *12 (Del. Super. Ct. Oct. 17, 2022) (internal quotation marks and citation omitted). "[I]f the contract at issue expressly addresses a particular matter, an implied covenant claim respecting that matter is duplicative and not viable." *Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, No. 2017-0500, 2018 WL 2727542, at *9 (Del. Ch. June 8, 2018) (citations omitted). RB's implied covenant claim is based on its allegations that Tufco made a "meritless, baseless, and false claim of force majeure." Counterclaim ¶ 191. But the validity of Tufco's notice of force majeure falls under the express terms of the Agreement, and RB has asserted claims against Tufco for allegedly violating the Agreement. Accordingly, the implied covenant counterclaim is duplicative of RB's breach of contract counterclaims and must be dismissed.

D. Tortious Interference with Contract

RB asserts that Griffin tortiously interfered with the Agreement and the August 2020 purchase order by causing or directing Tufco to decline to produce the required wipes under the contracts and to falsely claim force majeure. Tufco argues that RB has not stated a plausible tortious interference with contract claim against Griffin. A claim for tortious interference with a contract has five elements: "(1) the plaintiff had a contract or prospective contractual relationship with a third party; (2) the defendant interfered with the relationship; (3) the interference was intentional; (4) a causal connection exists between the interference and the damages; and (5) the defendant was not justified or privileged to interfere." *Brew City Redevelopment Grp., LLC v. Ferchill Grp.*, 2006 WI 128, ¶ 37 n.9, 297 Wis. 2d 606, 724 N.W.2d 879 (internal quotation marks and citation omitted).

In this case, RB alleges that it had a contractual relationship with Tufco through the Agreement and various purchase orders; Griffin interfered with the contracts by causing or directing Tufco to decline to produce the required wipes under the contracts and to falsely claim force majeure; and the interference was intentional because Griffin's members were aware of the Agreement, the August 2020 purchase order, and their terms but caused Tufco to breach anyway. RB asserts that there was a causal connection between the interference and the damages and alleges that, as a result of Griffin's interference, Tufco failed to produce any Lysol wipes for RB under the Agreement or as required by the purchase order and that RB planned and depended on those wipes as part of its business. It alleges that it expended significant resources disputing Tufco's false claim of force majeure. Finally, RB alleges that Griffin was not privileged to interfere with these contracts because Griffin would not have been endangered by Tufco's performance of its contractual obligations to RB.

By claiming that Griffin intentionally interfered with the contract, RB essentially repeats the elements of the cause of action without any substantive allegations to support its assertion. This is not sufficient to state a plausible claim for relief. While litigants need not plead extensive factual allegations, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The counterclaim contains no allegations of wrongful conduct by Griffin. RB's conclusory allegations do not provide the specificity required to cross the threshold from speculative to plausible. *See id.* ("Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." (internal quotation marks omitted)). Accordingly, RB has failed to state a tortious interference with contract counterclaim.

17

## CONCLUSION

For the foregoing reasons, Tufco's motion to dismiss RB's second, fourth, and fifth counterclaims (Dkt. No. 42) is **GRANTED**. RB's fraud in the inducement counterclaim against both Tufco and Griffin, breach of the implied covenant of good faith and fair dealing counterclaim against Tufco, and tortious interference with contract counterclaim against Griffin are dismissed. Griffin is dismissed as a counterclaim defendant in this case. All that remains is Tufco's breach of contract claim against RB and RB's three breach of contract counterclaims against Tufco.

**SO ORDERED** at Green Bay, Wisconsin this 30th day of June, 2023.

s/ William C. Griesbach
William C. Griesbach
United States District Judge