**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

TUFCO L.P.,

       Plaintiff,

   v.                            Case No. 1:21-cv-1199-WCG

RECKITT BENCKISER (ENA) B.V.

       Defendant.

**REPLY IN SUPPORT OF PLAINTIFF'S**
**MOTION TO COMPEL DISCOVERY PURSUANT TO RULE 37(a)(3)(B)(iii)**

Plaintiff Tufco L.P. ("Tufco") respectfully submits this Reply in Support of its Motion to Compel Discovery from Defendant Reckitt Benckiser (ENA) B.V. ("RB").

## INTRODUCTION

Despite RB's opposition, filled with tangential arguments and mischaracterizations, the core discovery dispute remains straightforward: RB refuses to provide basic facts and documents about its own damages claims. RB's counterclaims hinge on its contention that Tufco's alleged breach caused RB to be unable to fulfill customer orders, yet RB has persistently refused to identify which specific orders were affected, produce the underlying agreements, or share communications documenting the reasons for these cuts. In reality, these cuts were far more likely related to the drastic decline in consumer demand after early 2021 when it became scientifically accepted and widely understood that COVID-19's threat was airborne, and that routine cleaning with soap and

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

water (rather than disinfecting) sufficed for most settings.[1] In fact, research in the first months of 2021 established that the risk of infection by COVID-19 from surface transmission was about **one thousand times** less likely than from an airborne exposure.[2]

Rather than provide the requested documents and information about RB's own contentions, instead, RB generated and produced a single spreadsheet covering over 182,000 orders encompassing over 38,500,000 cases of wipes and essentially told Tufco to figure it out.[3] The spreadsheet includes a reasons code for cases cut from certain orders. While these are overwhelmingly "changes at customers request," other reasons applying to vast numbers of orders include "force majeure" and "supplier issue" with no more detail. In other words, the spreadsheet does not address who called the force majeure, on what basis, what reason was given or discussed for changes at customers' requests, or which supplier had what issue. The pertinence of such information is emphasized by the improperly equivocal language in RB's Amended Response to Interrogatory 12 claiming that cuts were due "in part" to a lack of supply. What else were the cuts

---

[1] For example, by March 24, 2021, the Centers for Disease Control released guidance acknowledging that "[t]he principal mode by which people are infected with SARS-CoV-2 (the virus that causes COVID-19) is through exposure to respiratory droplets carrying infectious virus," and that though "[i]t is possible for people to be infected through contact with contaminated surfaces or objects (fomites). . . the risk is generally considered to be low." Centers for Disease Control, CDC Archive, *Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments* (Mar. 24, 2021), https://archive.cdc.gov/www_cdc_gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html.

[2] *See* n. 1 *supra*; Xin Zhang et al., *Monitoring SARS-CoV-2 in air and on surfaces and estimating infection risk in buildings and buses on a university campus*, J. Expo. Sci. Environ. Epidemiol., Apr. 27, 2022 at 32(5):751–758, *available at:* https://pmc.ncbi.nlm.nih.gov/articles/PMC9045468/ (citing University of Michigan study of samples through April 2021).

[3] An RB Fed. R. Civ. P. 30(b)(6) witness even testified that RB maintains a "global standard on what reasons code" to apply for why a cut occurred; and yet no such document (which would clearly be responsive) has been produced in discovery. (Mosely Decl. Ex. A at 251:12–253:24.)

2

due to, to what extent was the lack of supply allegedly Tufco's responsibility, and how much of it was based, for example, on RB's internal manufacturing supply chain problems?

The spreadsheet alone is a factually deficient compilation that might serve RB's experts' needs, but the underlying contemporaneous documents, both internal and with customers, that address the bases for changed or cut orders (and likely undermine RB's claims) are relevant and necessary discoverable facts that Tufco has requested and is entitled to, to defend against RB's claimed damages—alleged to exceed $60 million plus some unspecified portion of over $168 million in lost gross sales. (*See* Dkt. 102-4.) RB's excuse that it does not earmark productions for customer purchase orders does not relieve RB of the requirement to produce the underlying responsive documents and information. To the contrary, it actually intensifies that need because RB's claim that it cannot be specific necessarily puts at issue all of the identified cut orders in its spreadsheet—exceeding 12 million cases. RB cannot plausibly contend that it does not have any contemporaneous documents addressing cuts to orders for more than 12 million cases of disinfecting wipes besides this spreadsheet.

Further, RB has refused to provide any specifics about a laundry list of damages it claims, which are in addition to its more straightforward lost profits claims. RB should not be put in a position to be surprised at trial by, for example, a claim that a specific customer relationship was harmed when nothing about it was disclosed in discovery because it happened to be some undisclosed number of unidentified customers hidden among the 182,000 rows of RB's spreadsheet.

RB does not argue that the responsive information is privileged, overly burdensome, or irrelevant. RB's position appears to be that it has produced everything it could possibly produce at this time. However, this is clearly false: at a minimum RB's opposition *confirms* that it has

3

withheld discoverable native data relating to its electronic data interchange ("EDI") system, that pertain directly to the question of which orders were cut, and provides no explanation for why this should not be produced. Because Tufco identifies this significant category of withheld information (along with the others described below), and because RB provides no reason why such information should not be produced, the Court should not hesitate to simply grant the motion to compel.

Finally, RB suggests that Tufco filed its motion to compel prematurely because RB was in the process of cooperating. But the trouble is that RB has been in the process of cooperating since last spring! Tufco issued the discovery requests at issue in April of 2024, and has been in constant meet and confer communications with RB about these exact issues since June of 2024. RB stopped communicating about these issues entirely after November 22, 2024, and did not reengage until January 14, 2025. Even when it did, RB's response was that it was *considering* whether it could provide supplemental responses. The Court should cut through RB's obfuscation and compel production of the foundational information Tufco needs to explore its available defenses.

## THE FACTUAL RECORD

Tufco's Motion noted a few background facts of the case for the purpose of contextualizing the aim of some of its discovery requests. The crux of RB's counterclaim is that it could have sold millions more disinfecting wipes had Tufco supplied them. But during this same timeframe, RB was suffering what it contemporaneously described as an "unprecedented reduction in demand" that left its logistics centers brimming with so much unpurchased product that it was in "grid lock." In fact, the situation was so dire that RB chose to *terminate* portions of its agreement with Tufco, and in doing so *knowingly ensured* that it would not receive any more wipes from Tufco. In short, there is significant reason to doubt RB's story that it could have sold millions more of the wipes

4

ordered under the Supply Agreement during this timeframe, and Tufco is entitled to explore these facts in discovery.

RB responds to Tufco's contextualization of the facts with a scattershot of false claims (without citation) that have nothing to do with this discovery dispute. In just two sentences, RB crams in at least four significant misrepresentations to manufacture a narrative that Tufco intentionally diverted resources in favor of a better-paying contract.[4] RB writes:

> Discovery has since revealed that Tufco's failure to produce *a single wipe* under the Agreement was not the result of some unforeseeable pandemic-related event, but instead a strategic and duplicitous business decision to enter into a contract with a new customer—a competitor of RB—*two weeks* before the January *force majeure* notice, and to produce *millions* of canisters for that customer . . . . Tufco undisputedly shorted RB millions of canisters of disinfecting wipes in the middle of a global pandemic, not because it did not have the labor and capacity to produce those canisters, as it has consistently alleged, but because it was more advantageous to Tufco to divert those resources to better-paying contracts (and then to collect penalties from RB).

(Dkt. 99 at 3) (Emphasis original). Everything about this is wrong. First of all, the entire premise— that Tufco had an incentive to divert resources from RB to the other customer, ███ ("Customer A")—is false. Critically (and omitted by RB), under the Supply Agreement Tufco was obligated to pay per-unit penalties to RB for nonperformance if the nonperformance was under Tufco's control. Tufco's agreement with Customer A did not contain a similar requirement, and so if anything Tufco was incentivized to divert resources to RB in order to avoid the risk of Tufco incurring penalties. Further, RB is a behemoth in the disinfecting wipes industry with whom Tufco had an extensive and positive pre-COVID-19 relationship including work and actively developed

---

[4] These distortions first appeared in a letter RB lodged with the Court in response to Tufco's request for the issuance of a letter of request. (Dkt. 93.) Since the letter requested no relief, Tufco chose not to burden the Court with a needless response letter at that time. Now that these mischaracterizations are repeated in RB's Opposition, they require response.

business on other projects and products: the notion that Tufco had any incentive or interest in jeopardizing their relationship with RB for a short-term fictional profit is both logically implausible and factually false.

Second, RB falsely claims that Tufco did not produce even "a single wipe under the Agreement" when in fact Tufco produced hundreds of thousands of T-Bone canisters, and continued to produce them until RB chose to eventually terminate that aspect of the Supply Agreement on or about August 20, 2021. (*See* Dkt. 38 at ¶ 31; Mosely Decl. Ex. B.) Third, RB falsely claims that Tufco entered into a contract with Customer A just weeks before claiming *force majeure*, and then "divert[ed]" resources to that customer, when in fact Customer A was an existing customer with volume commitments for canister disinfecting wipes starting in March 2020, whose production line had been staffed and running long before the Agreement at issue here. (*See* Mosely Decl. Exhs. C and D.) In other words, while unforeseen labor shortages made it impossible for Tufco to staff up RB's brand-new production line, it is unsurprising that Customer A's already-staffed and functioning production line was able to continue. What RB is really suggesting here is that Tufco was somehow obligated to divert resources from Customer A to RB.

Fourth and finally, RB falsely denies (without citation) that labor shortages caused the production delays at issue, when the contemporaneous record unambiguously establishes this fact, and indeed RB's own arguments rely on the existence of these labor shortages.[5] (*See* Mosely Decl. Ex. E.) The notion that there was some sort of scheme to "divert" resources away from RB is simply false.

---

[5] RB's (false) argument that resources were "divert[ed]" to another customer necessarily accepts that there was a shortage of resources in the first place. Otherwise Tufco would have simply staffed both lines.

# ARGUMENT

## I. TUFCO APPROPRIATELY FILED ITS MOTION TO COMPEL

Tufco's Motion set forth a detailed history of the parties' efforts to meet and confer about the discovery requests at issue, which Tufco propounded on April 2, 2024. While RB dismisses this endeavor as "juvenile," it was a necessary exercise to address how RB was predicted to (and in fact did) respond: by protesting that what the Court "will *not* see in Tufco's motion is any mention of RB's stubborn, unreasonable or outright refusal to produce responsive information." (Dkt. 99 at 4.) But as demonstrated in the Motion, the issue is not that RB has said "no." Instead, the issue is that RB endlessly responds "maybe." The record reveals a pattern: RB ignores entire communications (or the portions that relate to these discovery issues), then when pressed represents it will look into the issue. Weeks pass with no commitment as to whether or when it will produce the requested information, and Tufco reengages only for the cycle to start anew.

RB points to its January 14, 2025, final pre-motion communication to Tufco as evidence that Tufco "filed this motion anyways" despite RB's professed willingness to finally cooperate. (Dkt. 97-13 at 2). However, this ignores the context that RB had represented it was already doing this work in *November of 2024*. The parties held a November 22, 2024 teleconference where RB committed to responses by the first week of December, 2024, which Tufco documented in a contemporaneous email. (Dkt. 97-12 at 4.) Not only did RB *not* comply, it ignored follow-up emails on December 5, 2024, December 19, 2024, and January 10, 2025. (Dkt. 97-12 at 1–3.) Then, on January 14, 2025, nearly two months after RB committed to doing this work, RB represented it was "working with our experts *to determine whether* we can provide a computation" and that they would respond by January 31, 2025. (Dkt. 97-13 at 3.) (emphasis added). Enough is enough: RB must be compelled to comply with its discovery obligations.

## II. RB MUST RESPOND TO DAMAGES DISCOVERY

No doubt there are damages issues in this case that will require expert testimony, but this does not exempt RB from participating in fact discovery about its own asserted damages. "In short, a plaintiff's damages theory may not be crystallized in amber immune from investigation or analysis until some expert opines on damage numbers." *United States ex rel. Gill v. CVS Health Corp.*, 2024 WL 3028958, at *9 (N.D. Ill. June 17, 2024). Although the parties "will, eventually, make their way into expert discovery. . . . that eventuality does not excuse the parties, after five and a half years into the case, from having a discoverable assessment of damages." *Id. See also Gardner Denver, Inc. v. Air Pac. Compressors, Inc.*, 2021 WL 6137380, at *5 (E.D. Wis. Dec. 29, 2021) ("that damages analysis is sometimes better left to experts does not save Gardner Denver from its obligation to provide Air Pacific with 'information that [it] does have, limited though it might be.'") (citations omitted). Regardless of expert discovery timing, RB must provide Tufco with "whatever information it has, in a way that allows [Tufco] to understand its damages theory and calculations." *Gardner Denver*, 2021 WL 6137380, at *5.

RB overreaches in arguing that it is exempt from damages discovery until the expert discovery phase. Indeed, in the very first case RB cites, the court found that the nonmovant had failed to include "some basic identification of their damages theory" and ordered supplementation. *Milwaukee Elec. Tool Corp. v. Chervon N. Am. Inc.*, 2017 WL 2445845, at *7 (E.D. Wis. June 6, 2017). The cases that RB relies upon only absolve the nonmovant from "precise assessment" of damages before expert discovery, they do not generally immunize from disclosing the underlying facts. *See id.* In the *Tovar Snow* case, the court noted that though "a precise calculation. . . may need to await future expert testimony. . . . Unless this allegation is purely speculative, Tovar must have some information regarding what extra costs it incurred. . . ." *Tovar Snow Pros., Inc. v. ACE Am. Ins. Co.*, 2021 WL 4745376, at *5 (N.D. Ill. Oct. 12, 2021). Finally, in *Symbria*, the court was

8

persuaded that the nonmovant was literally "unable to provide any further information regarding these parts of their damages without expert testimony. . . ." *Symbria, Inc. v. Callen*, 2024 WL 4873437, at \*16 (N.D. Ill. Sept. 3, 2024). But as will be demonstrated below, there is a significant amount of information in RB's possession that it must provide to Tufco.

## III. RB MUST BE COMPELLED TO RESPOND TO DISCOVERY

### A. RB Must Supplement Its Responses to Interrogatory Nos 7 and 8.

RB refuses to disclose which orders are at issue in this case, which is what RB seeks in Interrogatory No. 7. This unfairly deprives Tufco of the ability to explore in discovery whether any particular order was cut due to a Tufco-caused lack of supply, as opposed to the "unprecedented reduction in demand" RB experienced in this time frame or any other reason why an order might be cut. For example, if Tufco learned in discovery that RB claims a specific customer had a large number of orders cut, Tufco would want to issue a subpoena and discover the reason behind the cuts. The customer might respond that they had no more need for disinfecting wipes at the time since demand had dried up after it became widely understood that surface transmission was minimal compared to airborne transmission of COVID. This would be highly relevant to Tufco's defenses and would also explain RB's motivations to attempt to cut free of its contractual obligations to Tufco. These are all issues of fact that Tufco is entitled to discover, and that are not at all the sole domain of expert discovery.

RB responds that it has produced a spreadsheet of every single cut order (182,000 of them!) "[i]n further response to Tufco's Interrogatories Nos. 7 and 8" and that this should suffice.[6] (Dkt. 99 at 8.) In the first instance this is wrong: neither interrogatory response incorporates the spreadsheet by reference. (*See* Dkt. 97-9 at 2–3; Dkt. 97-2 at 8.) In fact, RB's current response to

---

[6] RB included a sample of the spreadsheet as an exhibit to its opposition brief. (Dkt. 102-1.)

Interrogatory 8 stands on objections. (Dkt. 97-2 at 8.) While RB's failure to actually incorporate the document by reference seems like a minor point, the reality is that Tufco has asked for RB to do this basic task *no fewer than six times since October 7, 2024!* (Dkt. 97-11 at 4, 2; 97-12 at 9, 4, 2; 97-13 at 2.) Before filing its Motion, Tufco pleaded with RB to take the time to resolve this issue and received no response.[7] Even the supplemental interrogatory responses—that RB only served in response to this Motion, *contemporaneously with its opposition brief*—failed to amend responses to Interrogatories Nos. 7 or 8. (Dkt. 101-4.)

But more substantively, RB's position about requiring expert testimony makes no sense. The reason why a particular order was cut is an issue of fact, not an issue of expert testimony. Although RB produced a spreadsheet of every order that was cut *for any reason*, Tufco should not be required to conduct a scavenger hunt to figure out what orders RB contends are at issue. The Court in *CVS Health* explained this well:

> [A] document dump doesn't do the trick. A number of courts have held that, although Fed. R. Civ. P. 33(d) allows parties to respond to interrogatories by referencing business records, that doesn't apply to contention interrogatories. That makes sense here, as the defendant should not be made to 'answer its own interrogatories by filtering a mass of documentary evidence through an adversary's legal lens.'"

*CVS Health Corp.*, 2024 WL 3028958 at *9 (citations omitted). Similarly, here, Tufco should not be required to sift through 182,000 orders "through [RB's] legal lens" and try to determine which orders RB might want to claim were cut because of Tufco.[8] Moreover, RB has not identified any

---

[7] With respect to Interrogatory No. 8, on January 15, 2025, Tufco implored that "[a]ll Tufco needs on this is for RB to provide a supplemental interrogatory response that incorporates by reference the spreadsheet RB contends is responsive. Please provide this response by Friday, January 17 and we can avoid a motion to compel on this minor issue." (Dkt. 97-13 at 2.)

[8] At a bare minimum, RB must be ordered to list the orders that were cancelled due to supply issues and provide the internal and customer correspondence regarding same (per Request for Production No. 10, discussed further below).

subject matter that requires expert testimony. It is not clear how an expert witness could possibly determine which orders were cut due to alleged Tufco-caused shortages when RB itself claims not to know.

Ultimately it is RB's claim in this case that orders were cut because of Tufco, and in order for Tufco to have a fair chance to defend itself RB must identify those orders. RB should be compelled to supplement its responses to Interrogatories Nos. 7 and 8.

### B.      RB Must Supplement Its Responses to Interrogatory No. 12

RB provided a supplemental response to Interrogatory No. 12 along with its opposition brief, but it only partially responds to the outstanding issues. The fact that RB did so only in response to Tufco's motion to compel demonstrates the necessity of this motion, and RB's concession that the requested information is non-privileged and should have been produced. This justifies an award of attorneys' fees. *Novi Footwear Int'l Co. Ltd. v. Earth OpCo LLC*, 740 F. Supp. 3d 73, 79 (D. Mass. 2024) (awarding fees pursuant to Fed. R. Civ. P. 37(a)(5)(A) where "Belatedly, and perhaps still incompletely, the defendants provided the requested discovery after the plaintiff filed the second motion to compel."). RB had been promising it would prepare this response *since June 13, 2024*, and there is no reason to believe that it would have supplemented its responses without Tufco filing this Motion. (*See* Dkt. 97-4 at 2.)

Worse, the responses RB provided are still woefully incomplete. While RB provided more detail about the aggregate lost sales of disinfecting wipes that it claims, it still refuses to provide any details about the laundry list of other damages it claims. RB's supplemental response still includes wildly conclusory categories of damages with no explanation. It seeks "all damages to which it is entitled under law," and with respect to its claims arising from the T-Bone launch RB claims "diminished value of the business, lost business opportunities, costs associated with the

launch (including but without limitation media and promotional spending), lost deals with third parties, lost profits, damage to customer relationships, general harm to RB's business reputation and injury to goodwill." (Dkt. 101-4 at 2, 4.) This gives rise to many questions about RB's contentions that the response was required to answer: What lost business opportunities? What costs are associated with the launch of the new product? What lost deals with third parties? What customer relationships were damaged? What does RB mean by "all damages to which it is entitled under law"? What is the basis for RB's demand for attorneys' fees in a breach of contract case, where the Supply Agreement does not provide for fee shifting? All of these are discoverable facts that are encapsulated by Interrogatory No. 12 and must be answered.

It is particularly important that Tufco nail down these damages because RB's claims continue to change and balloon. At first RB claimed only lost profits.[9] Then in September of 2024 RB started claiming that Tufco is responsible for the failure of an entire product launch. (Dkt. 101-3.) Now, with its newest supplemental response, RB claims a new fanciful theory that it was "forced" to internally manufacture the products it ordered from Tufco—the same ones it agrees there was little demand for—and that it was damaged by doing this instead of producing other products that its customers actually wanted. (Dkt. 101-4.) The parties are several years into this case, and RB must be compelled to finally provide a specific list of damages so that Tufco can complete its fact discovery.

---

[9] Notably, it is unclear how any of these damages are recoverable given that, as RB's Counterclaim acknowledges, the Supply Agreement contains a limitation of liability clause (and that clause expressly waives loss of profits or revenues). (Dkt. 38 at ¶ 185.)

**C.      RB Must Supplement Its Responses to Requests for Production No. 10**

RB has failed to produce documents relating to its damages theories as requested in Requests for Production Nos. 10 and 17. RB claims that there are no additional responsive documents to these requests, but that is plainly false from the face of RB's opposition brief.

Request for Production No. 10 seeks documents substantiating the existence and purchase terms of the orders RB allegedly needed to cut, as well as internal and customer correspondence reflecting the cuts in orders and the reasons therefore. RB's claim that there is nothing further it can produce is simply false.

First, RB admits that "orders come in via EDI, which is electronic data exchange" but provides no reason why this data cannot be produced. (Dkt. 101-5 at 202:18–203:3.) Indeed, parties regularly exchange EDI in discovery. *EPAC Techs., Inc. v. Harpercollins Christian Publ'g, Inc.*, 2019 WL 109371, at *19 (M.D. Tenn. Jan. 4, 2019) (noting party's compliance with prior order to provide printed and "native electronic data interchange ('EDI') format"); *Kische USA LLC v. Simsek*, 2018 WL 620493, at *1 (W.D. Wash. Jan. 29, 2018) (referencing prior order to "produce electronic data interchange ('EDI') records. . . .") *Cable Elecs., Inc. v. N. Am. Cable Equip., Inc*., 2009 WL 2382561, at *3 (N.D. Tex. Aug. 4, 2009), as amended (Aug. 10, 2009) (noting that EDI was produced in discovery); *Seatrepid Louisiana, LLC v. Deep Ocean Eng'g, Inc*., No. CV 09-3360, 2009 WL 10737198, at *3 n.4 (E.D. La. Sept. 24, 2009) (noting that party "printed out information from the EDI system in response to a discovery request"). Because this information is plainly discoverable, RB should be compelled to produce it.

Second, though RB cites Rule 30(b)(6) testimony for the prospect that "there's no direct communication to our customers on a line by line or order by order basis," RB neglects to mention that the witness testified this was only true for "95% of [RB's] orders." (Dkt. 101-5 at 202:18–20.)

This means that there should still be *some* correspondence outside of EDI that RB should be compelled to produce. Any internal correspondence or correspondence with RB customers about orders being cancelled (and the reasons for same) should be ordered produced.

Third, RB admits that there are some "standard vendor agreements/terms and conditions" that exist for the orders at issue in this case. Yet inexplicably RB has refused to produce them or provide a reason why it cannot. Again, RB should be compelled to produce this plainly-discoverable information that is in its possession.

### D. RB Must Supplement Its Responses to Requests for Production No. 17

In the context of Interrogatory No. 12 it is evident that there are significant categories of damages for which RB has not provided all responsive documents. These would all be responsive to Request for Production No. 17, which seeks "All Documents and Communications Relating to [RB's] computation of [RB's] alleged damages." To the extent the Court orders RB to provide supplemental interrogatory responses, it should also compel RB to produce the documents that relate to any other damages theories.

## IV. THE COURT SHOULD AWARD ATTORNEYS' FEES

The record reflects extraordinary delay from RB and the Court should not hesitate to award Tufco its reasonable expenses pursuant to Fed. R. Civ. P. 37(a)(5)(A). Again, this is particularly true because the Motion induced RB to provide a (partial and incomplete) supplemental response that had been outstanding for several months. Per Rule 37(a)(5)(A), the Court must order the payment of such reasonable expenses if the motion is granted unless the movant filed the motion before attempting in good faith to obtain the disclosure, the opposing party's nondisclosure was substantially justified, or other circumstances make an award of fees unjust. Fed. R. Civ. P. 37(a)(5)(A)(i)–(iii). RB does not argue that any of these exceptions apply here, and indeed none

of them do. Therefore, the Court should require RB to pay Tufco's reasonable expenses incurred in making this motion, including attorneys' fees.

## V.      CONCLUSION

Tufco respectfully requests that the Court order RB to (i) provide complete responses to Tufco's Interrogatories Nos. 7, 8, and 12; (ii) produce all documents responsive to Requests for Production Nos. 10 and 17; and (iii) pay the Tufco's costs associated with this motion, including attorneys' fees pursuant to Rule 37(a)(5)(A).

Dated: February 28, 2025

Respectfully submitted,

**HANSEN REYNOLDS LLC**
By: */s/* James F. Cirincione
James F. Cirincione
301 N. Broadway, Suite 400
Milwaukee, WI 53202
Phone: (414) 326-4941
Facsimile: (414) 273-8476
Email: jcirincione@hansenreynolds.com

**RAINES FELDMAN LITTRELL LLP**
By: */s/* Laith D. Mosely
Laith D. Mosely
1900 Avenue of the Stars, 19th Floor
Los Angeles, CA  90067
Phone: (310) 440-4100
Email: lmosely@raineslaw.com

*Attorneys for Plaintiff Tufco LP*

15