## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

TUFCO L.P.,

     Plaintiff,

v.

RECKITT BENCKISER (ENA) B.V.,

     Defendant.

Case No. 21-CV-1199

**RECKITT BENCKISER (ENA) B.V.'S OPPOSITION TO PLAINTIFF'S
MOTION PURSUANT TO FED. R. CIV. P. 37**

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

COUNTER-STATEMENT OF FACTUAL BACKGROUND .......................................1

I.      Summary of the Litigation ...............................................................................1

II.     The Underlying Discovery Dispute ..................................................................3

        A.      Tufco's Motion Mischaracterizes and Expands the Scope of RFP No. 10 .............3

        B.      RB and RB's Counsel Made Good Faith and Diligent Efforts to Locate Customer Correspondence Regarding Cut Orders.................................5

        C.      Tufco's Underlying Motion to Compel.................................................7

        D.      Depositions Since the Motion to Compel Confirmed RB's Representations .........7

III.    Tufco's Subpoenaed Third-Party Discovery ..................................................10

        A.      Tufco's "Smoking Gun" Documents Are Smoke and Mirrors. ...........10

        B.      General Correspondence with RB Customers Are Not "Smoking Guns."............11

        C.      Correspondence about Changes to Allocation Are Not "Smoking Guns."...........12

        D.      Correspondence About Other Products Are Not "Smoking Guns." ....................14

        E.      Pre-March 1, 2021 Correspondence Are Not "Smoking Guns." .........................15

        F.      Correspondence about the Impact of COVID to RB's Factory in Hungary Is Not a "Smoking Gun"...............................................15

        G.      While Tufco Failed to Identify Any Cut Communications in its Moving Papers (Except for Arguably One), Even the Documents It Overlooked Are Insufficient to Warrant Sanctions................................16

LEGAL ARGUMENT ..............................................................................................17

I.      Tufco's Motion for Sanctions Under Rule 26(g) Should be Denied.................17

        A.      RB Did Not Violate Rule 26(g). ........................................................17

        B.      This Court Should Deny Tufco's Motion for Sanctions Under Rule 26(g) ..........20

II.     Because RB Did Not Violate Rule 26(a) or 26(e), Tufco's Motion for Sanctions under Rule 37(c) Should be Denied...................................................22

i

A.      RB Did Not Breach its Obligations Under Rule 26(a) or 26(e)............................. 22

B.      Even if this Court Were to Somehow Find RB Violated Rule 26, it Was Both Justified and Harmless. ................................................................ 23

      (1)     The prejudice or surprise to the party against whom the evidence is offered weighs against imposition of sanctions...................................................... 24

      (2)     The ability of the party to cure the prejudice weighs against imposition of sanctions................................................................................. 24

      (3)     There is no likelihood of disruption to the trial and, therefore, the third factor weighs against the imposition of sanctions. ................................... 25

      (4)     Consideration of the fourth factor, bad faith or willfulness involved in not disclosing the evidence at an earlier date, weighs against imposition of sanctions................................................................................. 25

C.      Tufco's Requested Sanctions Are Entirely Disproportionate and Should be Rejected.............................................................................................. 26

CONCLUSION.............................................................................................29

ii

**<u>TABLE OF AUTHORITIES</u>**

**Federal Cases**

*Am. Nat'l Bank & Trust Co. v. Equitable Life Assur. Soc'y of the U.S.*, 406 F.3d 867 (7th Cir. 2005) ............................................................................................................26

*Bracey v. Grondin*, 712 F.3d 1012 (7th Cir. 2013) .........................................................28

*Carlson v. Triton Indus.*, 605 F. Supp. 3d 1124 (W.D. WI 2022) ...................................28

*City of Rockford v. Mallinckrodt ARD, Inc.*, 326 F.R.D. 489 (N.D. Ill. 2018).......... 17-18

*Cohn v. Guaranteed Rate, Inc.*, 318 F.R.D. 350 (N.D. Ill. 2016)...................................28

*Cooke v. Jackson Nat'l Life Ins. Co.*, 919 F.3d 1024 (7th Cir. 2019)..............................21

*Davis v. Lakeside Motor Co., Inc.*, No. 3:10-CV-405, 2014 U.S. Dist. LEXIS 92091 (N.D. Ill. July 7, 2014)..............................................................................................18

*Doe v. City of Chicago*, No. 18-cv-3054, 2019 WL 5290899 (N.D. Ill. Oct. 18, 2019) ...................................................................................................................24, 27

*DR Distrib., LLC v. 21 Century Smoking, Inc.*, 513 F.Supp.3d 839 (N.D. Ill. 2021)..............18, 24

*Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398 (7th Cir. 1998) ..................................21

*Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, No. 1:10-cv-01376-TWP-DKL, 2015 WL 735724 (S.D. Ind. Feb. 20, 2015) ............................................................................28

*Est. of Mealman v. Wis. Mun. Mut. Ins.*, No. 21-C-820, 2023 WL 6318222 (E.D. Wis. Sep. 28, 2023) ................................................................................................. 24-25

*Hudgins v. Total Quality Logistics, LLC*, 2024 U.S. Dist. LEXIS 68004 (N.D. Ill. Apr. 15, 2024) ................................................................................................................27

*Jackson v. Murphy*, 468 Fed. Appx. 616 (7th Cir. 2012)................................................27

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371 (7th Cir. 2008) ........................................................................................................................26

*Langley v. United Elec. Co.*, 107 F.3d 510 (7th Cir. 1997) ............................................21

*LiiON, LLC v. Vertiv Grp. Corp.*, No. 18 CV 6133, 2020 U.S. Dist. LEXIS 82604 (N.D. Ill. 2020)........................................................................................................28

*Menard, Inc. v. Dall. Airmotive, Inc.*, No. 18-cv-844-WMC, 2020 U.S. Dist. LEXIS 136138 (W.D. Wis. 2020)........................................................................................26

iii

*Nationwide Agribusiness Ins. Co. v. Meller Poultry Equip., Inc.*, 2016 WL 8193571 (E.D. Wis. Jan. 22, 2016) ..........................................................................................................23

*Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 188 F. Supp. 3d 776 (N.D. Ill. 2016) ....................................................................................................................................21

*Rojas v. Town of Cicero, Ill.*, 775 F.3d 906 (7th Cir. 2015) .........................................21

*Schmude v. Tricam Indus., Inc.*, 550 F. Supp. 2d 846 (E.D. Wis. May 5, 2008)...........27

*Singer v. Primesource Health Group*, No. 17-cv-2127, 2019 U.S. Dist. LEXIS 233298 (N.D. Ill Aug. 5, 2019).....................................................................................................25

*Smithfield Foods v. United States*, No. 13-C-651, 2014 U.S. Dist. LEXIS 134523 (E.D. Wis. 2014)........................................................................................................................25

*Staffworks Grp.-Wis. Inc. v. Serv. First Staffing Inc.*, 2020 U.S. Dist. LEXIS 113665 (E.D. Wis. June 29, 2020) ................................................................................................27

*Tec-Air Inc. v. Nippondenso Mfg. USA Inc.*, 1994 WL 747890 (N.D. Ill. Aug. 22, 1994) ...........................................................................................................................................21, 24

*U.S. v. Community Health Network, Inc.*, No. 14-1215, 2023 WL 9788486 (S.D. Ind. Aug. 4, 2023) .............................................................................................................18, 20

*Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409 (7th Cir. 2019) ....................................24

*Varlen Corp. v. Liberty Mut. Ins. Co.*, No. 13-cv-05463, 2017 U.S. Dist. LEXIS 162110 (N.D. Ill. Sep. 25, 2017) ...................................................................................................23

**Rules**

Fed. R. Civ. P. 26.............................................................................................. 22-24

Fed. R. Civ. P. 26(a) ...................................................................................... 17, 22-23

Fed. R. Civ. P. 26(a)(2)...........................................................................................28

Fed. R. Civ. P. 26(e) .........................................................................................17, 22

Fed. R. Civ. P. 26(g) .......................................................................................*Passim*

Fed. R. Civ. P. 26(g)(3)......................................................................................20-21

Fed. R. Civ. P. 30(b)(6)...........................................................................................7

Fed. R. Civ. P. 37................................................................................... 22-24, 28

Fed. R. Civ. P. 37(c) ....................................................................................... 17, 22-24

iv

Fed. R. Civ. P. 37(c)(1) ..................................................................................................23

Fed. R. Civ. P. 37(c)(1)(A) ...........................................................................................23

Fed. R. Civ. P. 37(c)(1)(C) ............................................................................................23

v

# INTRODUCTION

The facts underlying this dispute are simple. In an attempt to maximize its profits from the Covid-19 pandemic, Tufco L.P ("Tufco") more than doubled its contracts to produce disinfecting wipes. Finding itself unable to scale up as quickly as it had hoped, Tufco failed to deliver wipes to Reckitt Benckiser (ENA) B.V. ("RB"), and claimed its poor planning was a *force majeure* event. Based on Tufco's breach, RB terminated its agreement with Tufco. Tufco then sought to further maximize its profits by suing RB for breach of contract. Now, in another attempt to shift blame to RB, Tufco attempts to materially change its Request for Production in order to argue that RB failed to adequately respond. Because RB's responses were substantially justified, awarding sanctions would be unjust and the motion should be denied.

## COUNTER-STATEMENT OF FACTUAL BACKGROUND

### I. Summary of the Litigation

On September 15, 2020, nine months into the COVID-19 pandemic, Tufco and RB executed a Supply Agreement (the "Agreement"), which required Tufco to produce, in part, 1.5 million 35- and 80-count Lysol Disinfecting Wipe Lemon & Lime Canisters ("Canisters") per month, beginning in March 2021. Thereafter, on January 27, 2021, Tufco claimed that labor shortages attributable to the pandemic caused "unforeseen" production issues impacting Tufco's volume commitments. On March 16, 2021, Tufco sent formal notice to RB, advising that it would not meet its volume commitments under the Agreement. Tufco claimed that those "unforeseen" production issues and labor shortages caused disruptions in its supply chain and should be deemed a "Force Majeure Event" under the Agreement, excusing Tufco from its obligations to produce. Tufco never produced a single Canister, and later advised that it would not produce Canisters under the Agreement at full capacity until September 2021, six months after the Agreement required, and a full year after executing the Agreement.

1

Because Tufco entered into the Agreement nine months into the COVID-19 pandemic, when its effects on both labor and production were widely understood, RB rightfully disputed Tufco's *force majeure* claim as entirely foreseeable (and contrary to the provision's express requirements). RB treated Tufco's failure to fulfill its commitments under the Agreement for what it was, a breach allowing for termination pursuant to section 20.1 thereof. In response, Tufco filed this action on October 15, 2021, claiming RB breached the Agreement. (ECF No. 1). RB filed its Answer and Counterclaims for breach of contract on December 16, 2022, seeking damages for Tufco's failure to produce. (ECF No. 38).

Discovery has since revealed that Tufco's failure to produce a *single*[1] Canister under the Agreement was not the result of any unforeseeable pandemic-related event. Rather, it resulted, frankly, from greed—specifically, Tufco's decision to take advantage of the pandemic, expand its business and manufacturing capabilities and take part in what Tufco's CEO described during his deposition as a "gold rush." During the pandemic, Tufco directed its sales team never to say no to any business, regardless of circumstance, and executive management largely ignored Tufco's operations and human resources teams' input on whether Tufco could actually deliver on its commitments. Indeed, at the same time it contracted with RB, Tufco signed *two* amended agreements and *four* brand new long-term contracts (with volume commitments) to produce, on a monthly basis, millions and millions of disinfecting wipes, increasing its customer base by 300% (in 2019, by comparison, it had *two* customer contracts). It added three canister manufacturing lines, for a total of five, increasing its capacity to produce canisters by 2000%, from 1M in 2019 to 20M by mid-2021; and it hired more employees than it had ever in the past. In fact, quite

---

[1] The Agreement required minimum monthly production levels for two Lysol-branded products – Canisters and T-Bone units. Tufco produced a small quantity – below the required monthly production level – of T-Bone units. It did not produce a single Canister.

ironically, by March 1, 2021—when Tufco was supposed to start production under the Agreement––Tufco had *more* canister lines, *more* production staff, and *more* capacity to produce the contracted-for products than at any other time and did, in fact, produce millions of canisters, just for other customers. Any "labor shortage" Tufco experienced, preventing its production for RB, was entirely self-induced.

As a result of Tufco's failure to produce even one of the millions of required Canisters under the Agreement, RB was forced to cut customer orders. RB's efforts, and ultimate inability, to produce customer communications concerning cut orders is the subject of this instant motion.

## II. <u>The Underlying Discovery Dispute</u>

### A. <u>Tufco's Motion Mischaracterizes and Expands the Scope of RFP No. 10</u>

At the outset, Tufco's RFP No. 10 sought information regarding RB's allegation that it was "forced to amend or adjust its orders based on Tufco's alleged inability to produce." (*See* Declaration of Michael Futterman dated July 29, 2025 (the "Futterman Decl.") at ¶ 2). The parties exchanged extensive correspondence regarding this and other discovery served by both parties.[2] One such letter from Tufco's counsel makes clear that it understood RFP No. 10 to seek documentation of cuts to customer orders:

> After reviewing RB's supplemental interrogatory responses regarding its damage claims and its document production to date, it has become clear that RB has failed to produce documents responsive to RFP 10 regarding RB's contention that it was forced to amend or adjust its orders based on Tufco's alleged inability to produce. RB seeks damages related to those purported adjustments

---

[2] Contrary to Tufco's representations in its moving brief, RB and Tufco did not spend "months" in meet and confer sessions discussing exclusively "what [Tufco] wanted and why." Indeed, all counsel to this litigation have worked fairly well together in meeting and conferring on various discovery disputes, which have included many more issues (from both sides) than just whether RB sufficiently responded to RFP No. 10. This includes, but is not limited to, a long and tortured back and forth whereby RB was ultimately forced to come before this Court to compel production of Tufco's other client documents—documents that are key to RB's contention that Tufco's inability to produce was self-inflicted. That motion was granted by the Court. (ECF 86).

in orders but fails to identify those adjustments in its interrogatory responses, *or produce documents that elucidate what specific orders it had to amend or adjust.*

(ECF 112-9 (emphasis added); Futterman Decl. at ¶ 3). RB responded to this letter that it had, indeed, already produced responsive documents. RB also offered to provide Tufco with a chart reflecting exactly what Tufco sought in RFP No. 10—details of every order cut for the products at issue during the relevant time period. (ECF 112-9 at p. 6). Thereafter, RB produced a 182,111 line excel report representing the details of *every order* (cut or otherwise) during the relevant time period, including the customer names, purchase order numbers, dates, quantities ordered, quantity cut if any, gross values, the *reason for the cuts* (inputted at the time of the cut), and other information synthesizing the thousands of purchase orders during the relevant time period (the "Cut Spreadsheet"). (Futterman Decl. at ¶ 3). The report is a business record which exports (without modification) all of the relevant native data from RB's SAP database. (*Id.*). It includes <u>all</u> of the information Tufco sought regarding cuts resulting from Tufco's breach, and otherwise. (*Id.*).

On several occasions, RB advised that, because it does not earmark its production for customer purchase orders,[3] it is impossible to determine which particular purchase orders were cut as a result of Tufco's failure to produce as required under the Agreement, but RB's damages[4] expert would determine the number of cuts and value thereof attributable to Tufco at the appropriate time in accordance with the Court's Scheduling Order. (Futterman Decl. at ¶ 4). **Only thereafter, in**

---

[3] As noted in Exhibit E (ECF 112-10 at p. 3), "RB does not earmark productions for customer purchase orders—rather, copackers provide product, that product is sent to distribution centers, and is then shipped out to RB customers, irrespective of which copacker was the manufacturer."

[4] Tufco claims repeatedly that RB seeks lost profits and cut damages for the entire two-year period of the Agreement. That is incorrect. As stated in interrogatory responses, RB recognizes that the demand for the products dropped after 2021 and seeks only lost profits or alternatively, cut damages, for 2021.

4

October 2024, did Tufco take the position that while the Cut Spreadsheet was "a responsive document," it was "an incomplete response." Tufco then made a new request for RB's "external communications with its customers, discussing the alleged cuts to the orders (or any other documents that communicated an order cut, either from RB to the customer or from the customer to RB)." (ECF 112-9 at p. 5; Futterman Decl. at ¶ 5).

The parties continued to meet and confer about this and other discovery issues. In one such discussion on November 22, 2024, RB explained that there were no customer communications regarding the cuts at issue because RB does not interact that way—the ordering process, including acceptance, adjustment and rejection of orders, is automated and counsel did not believe underlying communications existed. (Futterman Decl. at ¶ 6). Counsel for Tufco pushed back, and so RB agreed to diligently continue its search. (Futterman Decl. at ¶ 6). Inexplicably, in its moving brief, Tufco, again *incorrectly*, states that RB did not advise Tufco until January 14, 2025, "that the communications Tufco had been seeking for months did not exist." This is *false*.

### B. RB and RB's Counsel Made Good Faith and Diligent Efforts to Locate Customer Correspondence Regarding Cut Orders

After continued good faith efforts to locate customer communications regarding specific cut orders, which included discussions with several knowledgeable employees as well as targeted searches in RB's document litigation database,[5] RB reasonably concluded that, consistent with its SAP database practice, it had no communications with customers about the cuts at issue. (Futterman Decl. at ¶ 7-10). In that regard, the undersigned counsel spoke with several RB

---

[5] RB recently determined that several custodian queues were incomplete when transferred to counsel's litigation database. As soon as counsel learned of the issue, it requested full queues and immediately notified Tufco of the issue so that the parties could determine the best step forward for production and any other required actions.

employees, including Matthew Lindsey (Head of Customer Service, North America), Rodolfo Santana (Customer Service Excellence Manager), James Nadeau (Trade Marketing Director, Lysol US), John Yokomizo (SVP of Customer Marketing), Santiago Fernandez (Senior Finance Manager E-Commerce) and Igor Miyasaki (SBA Supply IS - USA) seeking information about the existence and location of customer correspondence regarding cuts. Each one reported that there was no such correspondence. (Futterman Decl. at ¶ 7-8). They reiterated that cuts are performed via electronic data interchange ("EDI") connected to RB's SAP manufacturing software/database. (Futterman Decl. at ¶ 8). Purchase orders are submitted to RB via that EDI. (*Id.*). If RB cannot fill the order, a notification that the order was "cut" is delivered to that customer's computer through the same EDI system. (*Id.*). These employees consistently confirmed and represented that, in the usual course of their business and, in light of RB's automated system, there are no direct communications with customers **regarding specific cut orders**—no emails, direct messages, or non-automated notifications regarding a specific cut or the reasons therefore. (Futterman Decl. at ¶ 9). Every "communication" occurs computer to computer, system to system. (Futterman Decl. at ¶ 9). Upon its reasonable and diligent inquiry, RB reaffirmed the same to Tufco in its January 14, 2025 correspondence, attached as Exhibit E to Mosely's Declaration, stating:

> With regards to the orders cut and the reasons therefore, RB produced an excel spreadsheet (beginning RB002347) containing 182,111 lines of information which includes every single order and cut during the relevant time period, detailed information regarding each (i.e. product description, customer, ship date, quantity of cases, shipped/cut cases, the gross value/shipped value/cut value, etc.) and where inputted at the time of the cut the reason code (RC) for the cut. Furthermore, when a cut does occur the communication is computer to computer, system to system – there were no emails or other communications regarding the cuts. The planners analyze the item and assign the reason code that best reflects why the order was cut; the computer then alerts the retailer that the order was cut. Otherwise, there is no direct communication.

(ECF 112-10 at p. 3, (emphasis in original).

C. Tufco's Underlying Motion to Compel

Tufco filed its January 24, 2025 Motion to Compel, seeking, in part and as relevant here, documents in response to RFP No. 10, described by Tufco as "correspondence documenting the reasons for the alleged cuts" (ECF 96-1, p 2); "documents relating to any particular cut in orders" (ECF 96-1, p 12); and "communications documenting the reasons for these cuts." (ECF 106-1, p 1). As highlighted in this motion, Tufco notes that "[t]he Motion to Compel included a request to compel responses to RFP No. 10," and specifically noted that "RB has failed to produce any correspondence or documents relating to any particular cut in orders." (ECF 112-2, p 10).

Based on its diligent inquiry, throughout the briefing and subsequent April 9, 2025 Motion to Compel Hearing (the "Hearing"), RB reasonably believed and maintained that there were no communications with customers *about the cuts at issue*. (ECF 112-11 at T13:2-7 ("[F]or the cut – the cut damages, there is no additional information that we can provide"); (T16:19-20 "There are no communications regarding these cuts"); (T23:7-9 "[A]fter an order is cut by the computer system, there is no communication back from the client saying, why is this cut? Why is that cut?") Now, Tufco comes before this Court, arguing that these representations were somehow incorrect because there are communications with customers *on other topics*. While administratively terminating the motion to compel, the Court noted that should RB's representations—that there are no communications regarding cuts—turn out to be untrue and should Tufco locate a "smoking gun" showing such communications, it is permitted to return to the Court and move for attorneys' fees regarding the same. *Id*. at p. 36. Thus, the instant motion.

D. Depositions Since the Motion to Compel Confirmed RB's Representations

In its moving brief, Tufco conveniently omits that, since the motion to compel was decided, RB has presented a **seventh** Rule 30(b)(6) witness to testify to numerous topics including:

7

30. RB's purchase orders or contracts or prospective purchase orders or contracts for Lysol Canister wipes that RB was unable to fulfill as a result of a product shortage from January 1, 2020, to December 31, 2022.

31. RB's purchase orders or contracts or prospective purchase orders or contracts for Lysol Canister wipes that RB amended or adjusted as a result of a product shortage from January 1, 2020, to December 31, 2022.

42. The document RB produced in the form of a spreadsheet beginning with bates label RB0024237, including how it was created, the sources of the data therein, the meaning of the terms appearing in the spreadsheet, and how the "cut classification" listed therein was determined.

(*See* Futterman Decl at Ex. A, Tufco's Amended 30(b)(6) Notice dated January 30, 2025). On June 9, 2025, John Yokomizo sat for almost six hours testifying, in part, as to RB's damages resulting from "cut" orders. Mr. Yokomizo testified as to how RB's EDI system works, how cuts are captured by the system, and how RB identifies and applies the corresponding reason codes reflected in the spreadsheet. As to RB's EDI system, Mr. Yokomizo confirmed that RB's supply system "links up" to its customers' systems, sharing with them the content of the orders and cuts. (Futterman Decl., Ex. B at 65:2-10). It is an automated system. (*Id.* at 66:17-22). If an order comes in, and there is no product, that order is automatically cut by the system based on the lack of inventory. (*Id.*) Any cuts that occur are done by this system, and not otherwise communicated to the customers in writing. (*Id.* at 65:2-10).

Mr. Yokomizo explained the Cut Spreadsheet contains data pulled directly from RB's internal system, representing orders that were actually placed, but ultimately cut, for the relevant products. (*Id.* at 54:25-55:24). He explained, in detail, the components of the Cut Spreadsheet, explaining what each column heading represented, clarifying acronyms, and correcting any of Tufco's misunderstandings. (*Id.* at 181:18-186:12). Mr. Yokomizo further explained how RB identifies and applies "reason codes" to cuts, as reflected in the Cut Spreadsheet. He explained the supply planners managing the orders input a reason code description, denoted in the Cut

Spreadsheet as "final RC desc," representing the reason an order was not fulfilled. (*Id.* at 146:18-147:7). This code is entered in the system at the time the order is cut. (*Id.* at147:16-20). Mr. Yokomizo reviewed some of the "reason codes" in the Cut Spreadsheet and confirmed that several orders would not be attributable to Tufco's breach (i.e. "Issues/Delays," "Changes at Customer Request," and "Credit Limit Exceeded"). (*Id.* at 148:19-149:5). Moreover, Mr. Yokomizo explained the corresponding Reason Code summary document. He provided additional context to what the reason codes were intended to indicate, and in doing so, similarly eliminated several categories of cut codes from the possible damages sought by RB (i.e. "Quality Issue," "Regulatory Issue," and "Artwork Delay"). (*Id.* at 162:4-163:7).

In the end, RB presented Tufco with every detail of every order during the relevant time period (cut or otherwise) including the customer names, purchase order numbers, dates, quantities ordered, quantity cut if any, gross values, the *reason for the cuts* (inputted at the time of the cut), and other information synthesizing the thousands of purchase orders during the relevant time period; provided the internal guidelines by which RB applies the corresponding reason codes; presented *two* corporate deponents (one, Matthew Lindsey, before the motion to compel and another, John Yokomizo, after) who explained, amongst many other things, how the EDI system works, how RB identifies the reason for the cut as reflected in the Cut Spreadsheet, what the reason codes mean, and which reason codes are attributable to Tufco.

As noted above, when Tufco sought communications with customers regarding the cuts at issue, RB performed targeted searches in its litigation database and reasonably inquired of several knowledgeable employees, all of whom stated that it was not the general practice of the Company to communicate with customers about cuts and that there would be no relevant documents. (Futterman Decl. at ¶¶ 7-10). Nothing in RB's reasonable, good faith investigation indicated any

cuts communications with customers existed. And nothing even suggests that relying on the results of that investigation was not substantially justified.

### III. Tufco's Subpoenaed Third-Party Discovery

    A.    Tufco's "Smoking Gun" Documents Are Smoke and Mirrors.

Tufco's Motion to Compel sought "correspondence documenting the reasons for the alleged cuts." (ECF 96 at 1). Accordingly, as the Court made abundantly clear at the Hearing, a "smoking gun" document would be a document or communication between RB and one of its customers providing context to an order cut reflected on RB's 182,111-line computer generated spreadsheet. Tufco seemed to understand that would be the *only* acceptable basis for sanctions, since it frames both its arguments and requests for relief in the context of customer communications, claiming that was the "category of documents" RB withheld, and asking the Court, in part, to preclude RB from presenting evidence that it cancelled customer orders as a result of shortages caused by Tufco.

To RB's knowledge, Tufco sent fifteen subpoenas and received over 4000 documents in response. Of the more than 17,000 pages produced in support of its pending motion for sanctions, Tufco identified just twelve purported "smoking guns." But the documents Tufco calls "smoking guns" are not communications between RB and any customer regarding an order cut to a product at issue. Instead, they deal with entirely different concepts (i.e. allocation), entirely different and unrelated products (i.e. flat pack wipes), and entirely irrelevant time periods (i.e. months before Tufco was even set to manufacture). This Court invited Tufco to return if it found the "smoking gun"—yet, every single document referenced in its moving papers fails. For this reason alone, Tufco's motion should be denied.

B.  General Correspondence with RB Customers Are Not "Smoking Guns."

One of the baseless accusations Tufco makes about RB's conduct is that RB was "in *constant* email contact with its customers about its orders," in "contravention [to] RB's previous representations." (ECF 112-2 at p. 11). Tufco blatantly and deliberately misquotes the Hearing transcript in an obvious attempt to mislead the Court. Tufco claims that RB's counsel responded that "nothing was being purposely withheld" to his statement that "there are no communications with clients." (ECF 112-2 at p. 11). That, however, omits entirely the remaining eight lines of Mr. Mosely's statement which makes clear that the exchange was about other unrelated documents (not at issue in the motion), not RB's position with regards to communications about cuts *with its customers*. (ECF 112-11 at T32:12-20). RB's *actual* position on the latter was much clearer: "[T]here are, with regards to the cuts, . . . there are no E-mails that we are aware of with customers." (*Id*. at T26:14-18).

RB has never represented to Tufco nor the Court that it was not in constant email contact with its customers—of course it was! RB never hid from this fact and explicitly told Tufco and this Court *exactly* that. (*Id*. at T16:2-7) ("Wal-Mart is our biggest customer, . . . and there are going to be, I don't think tens of thousands, I think hundreds of thousands of E-mails with RB, not as it relates to this product or this dispute or this case, but just as it relates to the relationship."). What RB maintained is that none of those communications are about cuts relevant to this case. RB made that statement numerous times on the record at the Hearing; throughout its prior briefing on Tufco's motion to compel; and more times than it can count at meet and confers, in email correspondence with Tufco's counsel. Needless to say, RB being in communication with its customers, generally, and not about order cuts, is *not* a basis for granting any form of relief requested by Tufco.

C. Correspondence about Changes to Allocation Are Not "Smoking Guns."

Five of the claimed "smoking guns," Exhibits G, O, P, Q, and R, address changes to allocation and are not responsive to RFP No. 10. Tufco characterizes the subject of these documents as attempts "to sell the products at issue to customers who did not want them because of oversupply." Notably neither communications about oversupply nor allocation are at issue here or were they at issue at Tufco's prior motion to compel.

Tufco is fully aware that communications about allocation and oversupply are not relevant to cuts. As explained in the 30(b)(6) testimony of RB's Matthew Lindsey, "[a]llocation is the distribution of product during a scarce supply." (Futterman Decl. Ex. C at 18:5-6). During COVID, RB "narrowed [its] portfolio" to "power SKUs" so it could produce certain in-demand products (i.e. the canisters at issue in this case), which he called "an extreme condition of allocation that [is] typically . . . never done." (*Id*. at 19:7-18.) Because of these extreme conditions, "allocation changed from week to week." (*Id*. at 24:12-17.) RB continued to "t[ell] retailers what to order for a full two years." (*Id*. at 26:7-14.) Mr. Lindsey's team was responsible for working with retailers to order the correct amounts and distribute the product accordingly, (*id*.), as well as consider how to prioritize customers. (*Id*. at 124:17-22). Every week, his team would meet, "take a snapshot of inventory that [it had]," as well as what would be produced in the next seven days. (*Id*. at 241:18-22). RB would evaluate fair share allocation based on RB's history with its customers, then direct its customers the appropriate quantities to order. (*Id*. at 242:1-3). Based on that allocation, RB's customers then placed their orders through RB's SAP system, from which the Cut Spreadsheet was generated. (*Id*. at 25:12-21). Mr. Lindsey explained that the orders on the spreadsheet "represent what we told retailers to order" and it was from these orders that cuts were made. (*Id*. at 252:17-20). Put simply, given the scarcity of product, RB would tell its customers what to order and if

12

there was a further lack of supply (for example due, to a supplier not supplying the requisite product) a cut would be made. It is those cuts that are at issue here—not the preceding allocation process.

Exhibits G and P to Tufco's motion represent some of the many routine communications with RB customers about a potential change in allocation, *not* an order cut—two entirely different concepts. In Exhibit G, a customer was offered an additional 5000-8000 Canisters, on top of the allocation it had already been awarded and the order it had already made. The customer's response that it did not need additional allocation was not an order cut or related to any cuts; those Canisters were never part of an order at all. Similarly, Exhibit O concerns allocation and unordered units; Exhibit P involves a change in allocation; Exhibit Q concerns products (including completely unrelated flat packs) coming off allocation; and Exhibit R simply states RB was filling at 100% on all relevant SKUs for a customer in July of 2021. Bottom line, not a single one of these communications has anything to do—directly or indirectly—with cuts, only allocation. Because Exhibits G, O, P, Q, and R deal with allocation, have *nothing* to do with order cuts, and *are not responsive to RFP No. 10*, none of these documents support Tufco's requested relief and should be disregarded by the Court.[6]

---

[6] Tufco may argue that RB should have produced the information from customer emails regarding allocation or demand. This, however, is baseless. First, those issues were not the subject of Tufco's motion. Second, RB has provided hours of corporate testimony on allocation and demand, spreadsheets and reports regarding the same, and otherwise has produced thousands upon thousands of documents on these topics, searching for both amongst the more than one million documents obtained from agreed-upon custodians as well as additional ones reasonably added over the course of discovery. It would have been burdensome, unreasonable and disproportionate to the needs of the case to also search for the same amongst emails with the more than 150 customers noted on the spreadsheet. (*See* ECF 112-8 (". . . RB further objects to this Request [No. 10] as vague and overly broad insofar as it seeks "[a]ll Documents and Communications relating to" a contention that "RB was forced to amend or adjust its orders based on Tufco's alleged inability to produce," including because this could encompass a potentially limitless amount of documents and information . . .")). In addition, after Batur Hussain's deposition, Tufco requested that RB

13

### D. Correspondence About Other Products Are Not "Smoking Guns."

Seven of the twelve documents, Exhibits G, H, I, J, L, M, and O, do not even address Canisters, let alone cuts to orders for Canisters, and are not responsive to RFP No. 10. The Agreement between RB and Tufco, and the entirety of this litigation, centers around Lysol Disinfecting Wipe 35ct/80ct Canisters and T-Bone wipes. It is *outrageous* for Tufco to even hint to this Court that RB had some obligation to search for documents—and should be sanctioned for failure to do the same—regarding flat pack cuts when it is fully aware that RB's damage claims do not include any flat packs, let alone flat pack cuts. Tufco does not even attempt to explain why correspondence about flat packs would be relevant to cuts to Canister orders, opting to claim without support that the different products are a "distinction without a difference."

By way of example, Exhibit H is a discussion regarding dissemination of flat pack dispensers and the fact that the customer has an overstock of flat packs; Exhibit I concerns a new pricing strategy for flat packs; Exhibit J involves a customer's entire order with RB, including for the products at issue in this case, but notes only that flat packs will not be ordered due to adequate stock; Exhibit L concerns an overstock of flat packs and a customer's decision not to purchase 10,000 additional cases of the same; Exhibit M concerns 15-ct flat packs and RB's inability to make a shipment in October 2020 (five months *before* Tufco was even set to produce!). There is no question that there was a substantial oversupply of flat packs during this time period and there has been deposition testimony and documents produced regarding the same—that oversupply and resulting gridlock in the various logistics centers however, has nothing to do with the cuts that form the basis of this motion.

---

produce documents from <u>all</u> of its demand planners. While RB believed it to be duplicative (especially in light of the comprehensive demand charts the parties agreed RB would produce) and burdensome, RB agreed to produce the same and the parties agreed that those documents could be produced after the discovery end date.

14

For these reasons, the Court should not consider Exhibits G, H, I, J, L, M, O which all concern flat packs—these documents are in no way responsive to Tufco's RFP No. 10 and have absolutely nothing to do with any order cuts. To represent otherwise is wholly improper.

E. Pre-March 1, 2021 Correspondence Are Not "Smoking Guns."

Two of the purported "smoking guns," Exhibits L and M, are dated well before Tufco was to begin production under the Agreement. RB is genuinely confused by Tufco's inclusion of these documents, which, by their very nature, cannot provide context to orders that were cut as a result of Tufco's inability to manufacture. Again, the impetus for this dispute is that Tufco believes there are communications between RB and its customers regarding the cuts that are reflected in the Cut Spreadsheet, a portion of which represents the damages RB sustained by Tufco's failure to manufacture under the Agreement. Any communications that occurred *before* Tufco was expected to manufacture (March 1, 2021), are irrelevant to the discovery Tufco seeks, as they necessarily cannot implicate cuts as a result of Tufco's breach (unless they address prospective cuts, which none do). Accordingly, Exhibits L and M should be disregarded by the Court as they are not responsive to RFP No. 10.

F. Correspondence about the Impact of COVID to RB's Factory in Hungary Is Not a "Smoking Gun"

The icing on the cake is Tufco's inclusion of Exhibit N, which reflects email correspondence: (i) about wipes, generally, and not necessarily the products at issue in this case; (ii) from two months *before* Tufco was even scheduled to produce canisters for RB; and (iii) addressing labor issues in Hungary. According to Tufco, RB "told Customer E that factories were 'hit pretty hard with Covid,' and that '[i]t was difficult getting the necessary labor to hit output production.'" The quoted document actually says, "But in short, these items come from *Tatabanya, Hungary* and the factory was hit pretty hard with Covid *back in late November/early December*.

It was difficult getting the necessary labor to hit output production." (ECF 112-9 at p. 2). It also neglects to mention that this statement is about two unrelated products—Airwick Pre-Poop Toilet Spray, Hawaiian Hotshot and Rosy Starlet scents. For a million reasons, Exhibit N, like the rest of the documents cited in Tufco's briefing, in no way supports Tufco's requested relief, was inappropriate to include in this motion, and is not responsive to RFP No. 10. It is far from a "smoking gun," by any stretch of the imagination, and should also be disregarded by this Court.

Tufco had ample time to search for and identify any alleged "smoking guns" in the subpoenaed productions – yet, it chose the twelve documents here, none of which suffice. Tufco had an obligation to provide the bases for its sanctions motion in its moving brief so that RB can respond and defend itself accordingly. It did not, and for that reason alone, its motion should be denied in its entirety.

G. While Tufco Failed to Identify Any Cut Communications in its Moving Papers (Except for Arguably One), Even the Documents It Overlooked Are Insufficient to Warrant Sanctions.

RB performed a number of targeted searches in the more than 17,000 pages produced in response to Tufco's customer subpoenas. It found several documents related to cuts, none of which though, reflect the reasons for any cuts as to the products at issue, except for cuts reports that are duplicative of the excel report provided in discovery.[7] Likewise, only one of the twelve exhibits appended to Tufco's motion, Exhibit K, even mentions cuts, although mostly generally. Tufco does not even argue that Exhibit K is relevant to Canister cuts but, instead contends that it is material due to its mention of logistics centers and allocation, again, issues wholly unrelated to RFP No. 10.

---

[7] Because Tufco chose to highlight documents that do not support its motion, RB expects that it will search for others for its reply. Given the importance of having complete briefing on a request so severe as sanctions, RB respectfully requests that it be allowed to respond to the same.

Regardless, the discovery of scant emails from account managers referencing cuts is not indicative of a practice of communicating with customers about these issues and is not reason for sanctions or otherwise. RB reasonably and in good faith relied on the representations of several employees including those in customer service who affirmed that these emails did not exist and that the general practice of the Company was not to engage in this manner – the fact that a few individual account managers may have had a different practice does not undermine this practice or indicate any intentional withholding of documents. Bottom line, RB performed searches within its litigation database for additional responsive documents and spoke with numerous individuals at RB each of whom attested to its computer-to-computer system, and lack of accompanying communications. Nothing in RB's reasonable, good faith search indicated any cuts communications with customers existed.

## LEGAL ARGUMENT

Tufco moves for sanctions on two bases: Fed. R. Civ. P. 26(g) and Fed. R. Civ. P. 37(c) (based on alleged violation of Rules 26(a) and 26(e)). As set forth below, neither is supported by the facts or law. Moreover, even if somehow this Court determined that RB violated its discovery obligations, the extreme sanctions of preclusion and adverse inference are entirely misplaced and not supported by the relevant case law.

**I.** **Tufco's Motion for Sanctions Under Rule 26(g) Should be Denied.**

**A.** **RB Did Not Violate Rule 26(g).**

As Tufco acknowledges, Federal Rule of Civil Procedure Rule 26(g) requires an attorney certifying discovery to attest that, "to the best of the person's knowledge, information, and belief formed after a reasonable inquiry," the response is complete and correct as of the time it was made. Crucially, this rule does not require that disclosure be "perfect," only that parties in litigation be diligent and act in good faith. *City of Rockford v. Mallinckrodt ARD, Inc.*, 326 F.R.D. 489, 492

17

(N.D. Ill. 2018). This is especially true "[i]n an era where vast amounts of electronic information is available for review" and "discovery in certain cases has become increasingly complex and expensive." *Id.* (citations omitted). This is why Rule 26(g) does not require an attorney to certify the truthfulness of the responses, only to "stop and think" about the responses and certify he or she has made "a reasonable effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand." *DR Distrib., LLC v. 21 Century Smoking, Inc.*, 513 F.Supp.3d 839, 952 (N.D. Ill. 2021).

Consistent with the same, an "attorney may rely on assertions by the client . . . as long as that reliance is appropriate under the circumstances. Ultimately what is reasonable is a matter for the court to decide on the totality of the circumstances." Fed. R. Civ. P. 26(g), advisory committee's note to 1983 amendment; *see also Davis v. Lakeside Motor Co., Inc.*, No. 3:10-CV-405, 2014 U.S. Dist. LEXIS 92091, at *5 (N.D. Ill. July 7, 2014) (concluding that counsel's inquiry was reasonable under Rule 26(g) because counsel relied on an employee who "had firsthand knowledge of this fact" and because "counsel had no other reason to disbelieve his client at that time"); *see also DR Distrib., LLC*, 513 F.Supp.3d at 953 (quoting same). As stated by the Southern District of Indiana, "seeking information from employees most likely to know said information is sufficient to establish that [the defendant] complied with its obligations in responding to . . . requests for production (i.e., that [the defendant] made a reasonable inquiry and reasonably relied on its employees' answers)." *U.S. v. Community Health Network, Inc.*, No. 14-1215, 2023 WL 9788486, *7 (S.D. Ind. Aug. 4, 2023). Accordingly, the standard under Rule 26(g) is that a "reasonable" inquiry or effort be made. The duty to make a reasonable inquiry or effort is satisfied if "the investigation undertaken by the attorney and the conclusions drawn therefrom are

reasonable under the circumstances." *Id.* (quoting Fed. R. Civ. P. 26(g), advisory committee's note to 1983 amendment)).

It cannot be disputed that RB and its counsel's conduct in responding to Tufco's RFP No. 10 meets this standard of reasonable inquiry and effort required by Rule 26(g). Indeed, Tufco's motion for sanctions under Rule 26(g) is based on wild speculation that directly contradicts the extensive meet and confer correspondence and the undersigned counsel's sworn Declaration. First, as set forth above, the "extremely limited" category of documents purportedly sought by Tufco (communications about cuts) was not identified as integral to Tufco's RFP No. 10 until counsel's meet-and-confer emails in October 2024. Moreover, since that time, RB and counsel exercised good faith by diligently inquiring of the employees likely to have relevant information regarding any communications with customers concerning specific cut orders and were consistently informed that no such correspondence exists. (*See* Futterman Decl. at ¶ 7-10) (stating interviews included Matthew Lindsey, Rodolfo Santana, James Nadeau, John Yokomizo, Santiago Fernandez and Igor Miyasaki). This conclusion made perfectly reasonable sense in light of RB's automated system, as described above. There was, therefore, no basis on which either RB or counsel would doubt the relevant employees' representations. If the ordering and fulfillment system is entirely automated between RB and its customers, including placing the orders and communicating cuts to orders, as depicted in the Cut Spreadsheet produced by RB, then there was no basis on which RB or counsel could conceive there would be any additional communications regarding individual cut orders. Notably, of course, Tufco was not seeking production of all communications between RB and its customers but, rather, communications regarding cut orders. Such communications, it reasonably appeared, did not exist.

19

B. This Court Should Deny Tufco's Motion for Sanctions Under Rule 26(g)

If somehow the Court determined that either RB or counsel violated Rule 26(g), the Rule's plain language provides that sanctions are only appropriate if the violation is "without substantial justification." Indeed, Rule 26(g)(3) states "[i]f a certification violates this rule without *substantial justification*, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both. The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation." Fed R.Civ.Pro. 26(g)(3) (emphasis added). Pursuant to relevant case law, RB and counsel were substantially justified in making the representation in the certification and should not be sanctioned. In *U.S. v. Community Health Network*, the Court found no violation of 26(g) where, similar to RB, "in conjunction with the subsequent steps taken, seeking information from employees most likely to know said information is sufficient to establish that CHN complied with its obligations in responding to Relator's requests for production (*i.e.*, that CHN made a reasonable inquiry and reasonably relied on its employees' answers)." 2023 U.S. Dist. LEXIS 235614, at *11-12. As noted by the Court, under Rule 26(g), "[a] party is substantially justified if it is 'justified in substance or in the main—that is, justified to a degree that could satisfy a reasonable person.'" *Id.* And, "[w]hen an attorney makes a reasonable inquiry and reasonably relies on information provided, the certification is substantially justified and sanctions under Rule 26(g)(3) are inappropriate." *Id.* (citations omitted).

As set forth above, RB and counsel diligently inquired of employees with relevant knowledge whether customer communications regarding specific cut orders existed and were consistently informed that they did not. (Futterman Decl. at ¶ 7-10). In accordance with their reasonable conclusion that no such documents existed based on their diligent inquiry, counsel

20

signed a certification for RB's RFP Responses. That certification was not false and was justified under the circumstances. *See Cf. Cooke v. Jackson Nat'l Life Ins. Co.*, 919 F.3d 1024, 1028 (7th Cir. 2019) (regarding sanctions under Rule 26(g), stating "[a] false certificate is a good reason for a financial penalty"); *Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 188 F. Supp. 3d 776, 789 (N.D. Ill. 2016) ("Rule 26(g)(3) does mandate the imposition of sanctions where a party knowingly certifies inaccurate or incomplete discovery responses without substantial justification.") (*citing* Fed. R. Civ. P. 26(g)(3)).

In the event the Court somehow concludes that Rule 26(g) was violated and determines sanctions are, therefore, required under Rule 26(g)(3), RB respectfully submits that this Court should exercise discretion to reach a measured sanction aimed at curing the situation. *See, e.g., Rojas v. Town of Cicero, Ill.*, 775 F.3d 906, 909 (7th Cir. 2015)); *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 408 (7th Cir. 1998) ("What type of sanction to impose in the event of a violation is a matter committed to the district court's discretion."). Case law is clear that the sanctions imposed must be no greater than necessary to cure the prejudice caused by the discovery violation. In other words, the sanction must be "'appropriate' under the circumstances," *Rojas*, 775 F.3d at 909, and proportionate to the failure to comply with discovery, *Langley v. United Elec. Co.*, 107 F.3d 510, 515 (7th Cir. 1997). While the sanction "may include an order to pay reasonable expenses," Fed. R. Civ. Proc. 26(g)(3), the imposition of monetary sanctions is not required.

Rather, RB respectfully submits, as Tufco requests in the alternative, that fact discovery be extended by ninety (90) days with the parties to meet and confer as to custodians and appropriate search terms; that RB produce any documents required by the Court; and that Tufco be permitted to depose or re-depose any witness(es) it reasonably deems necessary with RB paying the costs for any witnesses whose deposition must be retaken. *See Tec-Air Inc. v. Nippondenso Mfg. USA*

21

*Inc.*, 1994 WL 747890 (N.D. Ill. Aug. 22, 1994) (issuing sanctions for violations of Rules 26 and 37, specifically the reopening of discovery). Under the circumstances, this seems to be the most equitable measure to cure the situation.

## II. Because RB Did Not Violate Rule 26(a) or 26(e), Tufco's Motion for Sanctions under Rule 37(c) Should be Denied.

### A. RB Did Not Breach its Obligations Under Rule 26(a) or 26(e).

Tufco baldly contends that RB must have violated its obligation under Rule 26(a) (initial disclosures) or under Rule 26(e) (duty to supplement), because it did not produce customer correspondence in response to RFP No. 10 and, therefore, should be subjected to sanctions under Rule 37(c). (ECF 116, p.19). However, as set forth above, RB produced responsive documents regarding cut orders as represented by its automated system. Moreover, it made diligent inquiry to employees with knowledge who consistently represented no customer communications regarding specific or individual cut orders existed. Further, the employees' representations that no customer communications regarding specific or individual cut orders existed was unequivocally reasonable in light of RB's all-encompassing automated system. As such, RB and counsel reasonably concluded and represented to Tufco and this Court that no such documents existed and RB produced a spreadsheet representing all cut orders during the relevant time period and informed Tufco that it would produce expert opinion evidence analyzing the spreadsheet and calculating the cut orders tied to Tufco's breach of the Agreement. (*See* Futterman Decl. at ¶¶ 7-10). Undoubtedly then, as RB's counsel was justified in signing the Rule 26(g) certification, RB's failure to produce customer communications regarding specific cut orders pursuant to Rule 26(a) and (e) was similarly justified.

B. Even if this Court Were to Somehow Find RB Violated Rule 26, it Was
   <u>Both Justified and Harmless.</u>

Only once a violation of Rule 26 is found does a court move on to determine whether Rule 37 sanctions are warranted, based on whether the acts were (i) justified or (ii) harmless. Under Rule 37(c)(1), if a party fails to provide information required by Rule 26(a) or (e), a court may "order payment of the reasonable expenses, including attorney's fees, caused by the failure," and it may "impose other appropriate sanctions." Fed. R. Civ. Pro. 37(c)(1)(A), (C). *See also Varlen Corp. v. Liberty Mut. Ins. Co.*, No. 13-cv-05463, 2017 U.S. Dist. LEXIS 162110, at *8 (N.D. Ill. Sep. 25, 2017) (Rule 37(c)(1) "allows the court to impose lesser sanctions '[i]n addition to or instead of this sanction.'") (citations omitted). As set forth above, RB did not violate either Rule 26(a) or 26(e) and, therefore, this Court's consideration of Tufco's motion for sanctions under Rule 37 should end there.

   i.   *RB's Conduct was Justified*

Even if this Court were to somehow find RB violated Rule 26, RB respectfully submits that, as set forth above, any violation was justified.

   ii.   *RB's Conduct was Harmless*

Sanctions under Rule 37(c) require a finding of "willfulness, bad faith, or fault." *Nationwide Agribusiness Ins. Co. v. Meller Poultry Equip., Inc.*, 2016 WL 8193571, *3 (E.D. Wis. Jan. 22, 2016) (quoting *Am. Nat'l Bank & Trust Co. v. Equitable Life Assur. Soc'y of the U.S.*, 406 F.3d 867, 877 (7th Cir. 2005)). There is no basis for this Court to find RB acted willfully, in bad faith or with fault in its response to Tufco's RFP No. 10. However, to the extent this Court nevertheless considers what might be an appropriate sanction under Rules 26 or 37, the Seventh Circuit Court of Appeals provides the following factors to consider: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice;

23

(3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 417 (7th Cir. 2019) (quotation omitted); *DR. Distrib., LLC*, 513 F.Supp.3d at 960-61.

As detailed below, all four factors for determining sanctions under Rule 37(c) weigh against their imposition. Curiously, Tufco's brief in support of its motion fails to even mention the relevant factors let alone explain how they might be met.

> *(1) The prejudice or surprise to the party against whom the evidence is offered weighs against imposition of sanctions.*

Here, it appears that both parties, Tufco and RB, were surprised by the existence of the documents at issue. Moreover, given the small number of documents raised by Tufco's motion and their largely irrelevant nature, there is little prejudice to Tufco, if any. However, as noted below, any prejudice can be cured.

> *(2) The ability of the party to cure the prejudice weighs against imposition of sanctions.*

The prejudice purportedly suffered by Tufco can be cured by reopening discovery for a limited, defined period of time, as Tufco requests in the alternative, with the parties to meet and confer as to custodians and appropriate search terms, for RB to produce any documents required by the Court, and for Tufco to depose or re-depose any witness(es) it deems necessary, with the costs of any such re-deposing to be borne by RB. *See Doe v. City of Chicago*, No. 18-cv-3054, 2019 WL 5290899, at *9 (N.D. Ill. Oct. 18, 2019) (allowing limited reopening of fact and expert discovery to cure errors)*; Tec-Air Inc.,* 1994 WL 747890 (issuing sanctions for violations of Rules 26 and 37, specifically the reopening of discovery); *Est. of Mealman v. Wis. Mun. Mut. Ins.*, No. 21-C-820, 2023 WL 6318222, at *2 (E.D. Wis. Sep. 28, 2023) (declining to impose discovery sanctions because court was able to alleviate potential prejudice to plaintiff by extending discovery and dispositive motion deadlines). Under the circumstances, and given that there is no irremediable

prejudice aside from delaying trial, this seems to be the most equitable measure to cure the situation.

> *(3) There is no likelihood of disruption to the trial and, therefore, the third factor weighs against the imposition of sanctions.*

Here, no trial date has yet been set. As such, this factor does not weigh in favor of sanctions. *See Est. of Mealman*, 2023 WL 6318222 at *2 (declining to impose discovery sanctions where, "[a]ny potential prejudice to Plaintiff can be alleviated by extending the discovery and dispositive motion deadlines"); *Smithfield Foods v. United States*, No. 13-C-651, 2014 U.S. Dist. LEXIS 134523, *14-15e (E.D. Wis. 2014) ("Given the Court's trial calendar, the additional discovery that will be necessary … will not significantly delay the trial of this matter.") In *Singer v. Primesource Health Group*, No. 17-cv-2127, 2019 U.S. Dist. LEXIS 233298, *4-5 (N.D. Ill Aug. 5, 2019), the court concluded that this factor was not met where "there is no risk of disruption to trial." Similarly, here, there is no risk of disruption at trial as fact discovery just closed and can be re-opened for this limited purpose, if the Court believes that to be appropriate.

> *(4) Consideration of the fourth factor, bad faith or willfulness involved in not disclosing the evidence at an earlier date, weighs against imposition of sanctions.*

As described throughout this brief, RB made every reasonable effort to, and *did*, produce documents in response to RFP No. 10 (including the requested details of *every cut* RB made to the products during the relevant time period), supplemented its production as Tufco's request expanded to include additional context about those cuts (including the internal guidelines by which RB applies the corresponding reason codes), and put forth two 30(b)(6) witnesses to testify to a host of topics including how the EDI system works, and as to the spreadsheet at issue, how it was created, the sources of the data therein, the meaning of the terms appearing in the spreadsheet, and how the "cut classification" listed therein was determined. RB interviewed numerous RB employees about whether these communications existed and where they might be located.

Invariably, their responses were the same—RB did not communicate with its customers about order cuts, and as such, these documents did not exist. RB lawfully and reasonably relied on these affirmations in good faith. Performing additional searches, with no direction, of the queues of every RB employee of every level who worked with every one of RB's approximately 150 customers at any point in the relevant period for documents that by every indication *did not exist* is simply not a reasonable effort to expect from RB under the standards cited and not a basis for the imposition of sanctions.

Because the record shows no sanctionable conduct and indeed demonstrates that RB engaged in good faith, without any indication of "willfulness, bad faith, or fault," sanctions are not appropriate. *Am. Nat'l Bank & Trust Co.*, 406 F.3d at 877. *Compare Menard, Inc. v. Dall. Airmotive, Inc.*, No. 18-cv-844-WMC, 2020 U.S. Dist. LEXIS 136138, *30 (W.D. Wis. 2020) (declining to find bad faith or willfulness even though defendant failed to produce documents in violation of court order, waited five months after they were identified, court determined there was "air of gamesmanship, or even sharp practice, in such a late production," and production was made only several months in advance of trial); *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371 (7th Cir. 2008) (affirming district court's imposition of sanctions where plaintiff was "less than forthright in its use of third-party subpoenas" where it failed to provide defendant copies of the subpoenas, failed to timely provide copies of the responses, and then lied about when those documents were received).

C. Tufco's Requested Sanctions Are Entirely Disproportionate and Should be Rejected.

Tufco asks that the Court "preclude the damage theories that RB was protecting by withholding the requested documents and grant adverse inferences against RB based on the small subset of documents that Tufco was able to obtain . . . ." (ECF 112-2 at p. 7). Under the

26

circumstances, these requests are wildly unfounded, overly severe and not proportional to any potential infraction of RB. As the Seventh Circuit notes, "[t]he severity of a sanction should be proportional to the gravity of the offense." *Jackson v. Murphy*, 468 Fed. Appx. 616, 619-20 (7th Cir. 2012). "Before it sanctions a litigant under its inherent power a court must find the party, 'willfully abused the judicial process or otherwise conducted litigation in bad faith.'" *Id*. (concluding that sanction was warranted where plaintiff "both perjured himself and forged a document critical to the prosecution of his case."). As this Court has held, if sanctions are warranted, they should be "proportionate to the circumstances surrounding a party's failure to comply with discovery rules" or court orders regarding discovery. *Staffworks Grp.-Wis. Inc. v. Serv. First Staffing Inc*., 2020 U.S. Dist. LEXIS 113665 (E.D. Wis. June 29, 2020).

With regards to exclusion, the Seventh Circuit has expressly cautioned courts to consider alternative sanctions available. *Doe v. City of Chicago*, No. 18-cv-3054, 2019 WL 5290899, at *9 (N.D. Ill. Oct. 18, 2019) (citing *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 760 (7th Cir. 2004)). "[B]ecause exclusion can be fatal to a party's case, the court should carefully consider the issue before ordering such a drastic sanction." *Schmude v. Tricam Indus., Inc*., 550 F. Supp. 2d 846, 853 (E.D. Wis. May 5, 2008). Exclusion is considered "an extreme and harsh remedy" and justice is normally dispensed by the hearing of cases on their merits. *Doe,* 2019 WL 5290899 at *31 (denying exclusion but allowing limited reopening of fact and expert discovery to cure errors). When the court can cure the prejudice caused by discovery failures, while still allowing the case to be heard on its merits, exclusion of evidence is not an appropriate remedy. *See id. See also Hudgins v. Total Quality Logistics, LLC*, 2024 U.S. Dist. LEXIS 68004, *27-28 (N.D. Ill. Apr. 15, 2024) (rejecting Magistrate's exclusion recommendation where it would "effectively amount to entering judgment on liability" and holding "there is no irremediable prejudice aside from the

27

delay in the plaintiffs having their day in court and the extra preparation time involved . . . . Although [Defendant's] conduct was inappropriate and unjustified, the record does not support imposing a sanction that amounts to the same, or virtually the same, as a finding of liability."); *Carlson v. Triton Indus.*, 605 F. Supp. 3d 1124, 1130 (W.D. WI 2022) ("While plaintiff clearly failed to meet his Rule 26(a)(2) disclosures timely, motions to strike are generally disfavored and the court is loath to have the results in this case turn solely on procedural missteps, especially when the defendant was not prejudiced."); *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, No. 1:10-cv-01376-TWP-DKL, 2015 WL 735724, at *3 (S.D. Ind. Feb. 20, 2015) (applying the four factors for Rule 37 sanctions and finding that exclusion sanction was inappropriate). According to the facts here, exclusion is not warranted.

Awarding an adverse inference is no more appropriate. In the Seventh Circuit, "the adverse instruction sanction is most commonly used in circumstances where there is evidence that a party has tampered with or destroyed documents in bad faith," *LiiON, LLC v. Vertiv Grp. Corp.*, No. 18 CV 6133, 2020 U.S. Dist. LEXIS 82604 (N.D. Ill. 2020) (citing *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 548-49 (7th Cir. 2017)), and is considered one of the "most extreme sanctions available pursuant to the Federal Rules of Civil Procedure and this Court's inherent power." *Cohn v. Guaranteed Rate, Inc.*, 318 F.R.D. 350, 355 (N.D. Ill. 2016); s*ee, e.g., Bracey v. Grondin*, 712 F.3d 1012, 1018-19 (7th Cir. 2013) (affirming denial of request for adverse inference instruction where party destroyed relevant evidence but the record lacked evidence of bad faith, holding "[i]n this circuit, when a party intentionally destroys evidence in bad faith, the judge may instruct the jury to infer the evidence contained incriminatory content. ... When considering the propriety of such an adverse inference instruction, '[t]he crucial element is not that the evidence was destroyed

but rather the reason for the destruction.' . . . A party destroys a document in bad faith when it does so 'for the purpose of hiding adverse information.'") (citations omitted).

Here, RB did not destroy any evidence and did not conduct the requisite inquiry or search for responsive documents with the "purpose of hiding adverse information"—it did so in good faith. Moreover, Tufco does not even seek an adverse inference as to the communications at issue––those regarding cuts. Rather, it asks for an overbroad (and convoluted) adverse inference regarding demand, one that is not appropriately before the Court. (*See* ECF 116 at p. 22) (granting adverse inferences that as a result of misrepresentations made by RB during discovery in this case, communications between RB and its customers about Lysol's disinfecting wipes products that were withheld from Tufco are deemed to support Tufco's and refute RB's assertions concerning demand for the products at issue in the Supply Agreement). For this reason alone, it should be denied.

## CONCLUSION

For the foregoing reasons, RB respectfully requests that the Court deny Plaintiff's Motion. Dated this 29th day of July 2025.

<div style="margin-left:2em">

**DUANE MORRIS LLP**
*Attorneys for Reckitt Benckiser (ENA) B.V.*

*s/ Michael R. Futterman*
Michael R. Futterman NJ Bar No. 016622004
MRFutterman@duanemorris.com
200 Campus Drive, Suite 300
Florham Park, NJ 07932
Phone:  973-424-2082
Fax:  973-424-2001

</div>

**GASS TUREK LLC**
*Attorneys for Reckitt Benckiser*

s/ Tamar B. Kelber
Tamar B. Kelber SBN 1101802
kelber@gassturek.com
Stephen T. Trigg, SBN 1075718
trigg@gassturek.com
Joshua I. Bernstein, SBN 1107914
bernstein@gassturek.com
241 North Broadway, Suite 300
Milwaukee, WI 53202
Phone: 414-223-3300
Fax: 414-224-6116